## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

IN RE:

Case No.  A-08-CA-574-SS

ARTHROCARE CORPORATION SECURITIES
LITIGATION

_____

## O R D E R

BE IT REMEMBERED on June 18, 2010, the Court held a hearing in the above-styled cause, and the parties appeared through counsel.  Pending before the Court were Defendant ArthroCare Corporation's ("ArthroCare") Motion to Dismiss [#166] and the appendix thereto [#167], Lead Plaintiff DeKalb County Pension Fund's ("Plaintiff") response [#186], and ArthroCare's reply [#194]; Defendant David Applegate's ("Applegate") Motion to Dismiss [#168], Plaintiff's memorandum in opposition [#184], and Applegate's reply [#193]; Defendant John T. Raffle's ("Raffle") Motion to Dismiss [#170], Plaintiff's memorandum in opposition [#182], and Raffle's reply [#198]; Defendant Michael Baker's ("Baker") Motion to Dismiss [#172], Plaintiff's response thereto [#188], and Baker's reply [#196]; Defendant Michael Gluk's ("Gluk") Motion to Dismiss [#169], Plaintiff's response thereto [#180], and Gluk's reply [#195]; Defendant PriceWaterhouseCooper's ("PwC") Motion to Dismiss [#171], Plaintiff's response thereto [#190], and PwC's reply [#192]; and Plaintiff's Motion for Leave to File a Sur-Reply to Baker's Motion to Dismiss [#200].  Because there has been no response to Plaintiff's  Motion for Leave to File a Sur-Reply to Baker's Motion to Dismiss [#200], the Court assumes it is unopposed and hereby GRANTS the motion.  Thereafter, considering all the foregoing documents, the case file as a whole, the applicable law, and the arguments of counsel at the hearing, the Court enters the following opinion and orders.

**Background**[1]

## I.      General Allegations

This is a consolidated securities class action suit against ArthroCare, an Austin-based public company that develops, manufactures, and markets minimally invasive surgical products.  Also named as defendants are various former executives of ArthroCare—Michael Baker, Michael Gluk, John Raffle, and David Applegate[2]—and ArthroCare's auditor, PwC.  The case arises from ArthroCare's November 18, 2009 restatement (the "Restatement"), in which it restated its earnings from 2004 through the first quarter of 2008, and made numerous admissions of wrongdoing and lack of internal controls.  CCAC [#139] at ¶ 8.  The Court appointed Plaintiff as lead plaintiff in this case on December 9, 2008.  *See* Dec. 10, 2008 Order [#99].

Plaintiff brings suit on behalf of all persons or entities who purchased common stock in ArthroCare between May 10, 2005 and February 18, 2009 (the "Class Period").  CCAC at ¶ 1.  Plaintiff alleges ArthroCare and the Individual Defendants made public statements during the Class period—including statements to investors during earnings conference calls, in press releases, and in filings with the Securities and Exchange Commission ("SEC")—that were materially false and

---

[1]The following is taken from the allegations in Plaintiff's Consolidated Class Action Complaint [#139] (the "CCAC"), except as otherwise indicated.  Thus, the facts are stated in the light most favorable to Plaintiff.  This is so because when "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Although, in the interest of brevity, every allegation in the CCAC is not recounted here, the Court is mindful of its duty to consider "the complaint in its entirety," *id.*, and has done so.

[2]Baker and Gluk are collectively referred to as the "Individual Defendants."  Baker joined ArthroCare in 1997 as President and CEO and a director of the company.  He served in that capacity at all times material to this lawsuit.  CCAC at ¶ 15.  Gluk joined ArthroCare in 2004 as Vice President of Finance and Administration.  In 2006, he was promoted to Senior Vice President and CFO.  *Id.* at ¶ 16.

Raffle, and Applegate are collectively referred to as the "Control Person Defendants."  During all times material to this lawsuit, Raffle held the position of Vice President of Corporate Development and Legal Affairs until he was promoted to Senior Vice President and General Manager, Strategic Business Units in May 2006.  Applegate was Senior Vice President and General Manager of ArthroCare's Spine division.  *Id.* at ¶¶ 21-22.

misleading with respect to the true nature of ArthroCare's affairs, and failed to disclose a number of fraudulent and improper practices within the company (of which the Individual Defendants were aware). *Id.* at ¶ 2.  Therefore, Plaintiff seeks to hold ArthroCare and the Individual Defendants liable for violations of § 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder. *Id.* at ¶¶ 546-57.  Plaintiff also alleges the Control Person Defendants had direct control over the activities or public statements of ArthroCare and participated in the improper activities and fraudulent statements in question, and are therefore liable as "control persons" under § 20(a) of the Securities and Exchange Act.  *Id.* at ¶¶ 3; 570-74 .  Finally, Plaintiff alleges PwC's statements accompanying several of ArthroCare's public filings during the Class Period were materially false and misleading, and PwC was either aware of this or severely reckless in not being aware, and is therefore liable under § 10(b) of the Securities and Exchange Act and Rule 10b-5.  *Id.* at ¶¶ 4; 558-69.

## II.    Improper Practices

The principal fraudulent and improper practices complained of by Plaintiff can be divided into two main areas: (a) insurance billing and healthcare compliance, and (b) accounting and internal controls.

### A.    Insurance and Healthcare Compliance

#### i.    DiscoCare

ArthroCare has three core business units: Sports Medicine, Ear Nose Throat, and Spine.  *Id.* at ¶ 28.  In 2000, ArthroCare's Spine division began manufacturing and marketing "Spine Wands": surgical devices that use ArthroCare's patented technology to remove disc tissue in herniated discs (a procedure that is commonly referred to as a "PDD," or Percutaneous Disc Decompression).  *Id.* at ¶¶ 29-30.  In or around 2004, insurance companies became reluctant to reimburse for PDD procedures because they questioned the effectiveness of the procedure and generally characterized it as

experimental, and thus non-reimbursable. *Id.* at ¶ 32. These reimbursement issues concerned physicians, and Spine Wand sales flattened in 2004 and 2005. *Id.* at ¶ 39.

However, in 2005 ArthroCare became aware of a promising solution to the reimbursement problem, which had been developed by Palm Beach Lakes Surgery Center ("PBLSC"), ArthroCare's largest customer for Spine Wands. PBLSC had begun pursuing reimbursement for Spine Wands not through healthcare insurance companies, but through liability claims to casualty insurers. Specifically, PBLSC had developed a network of personal injury lawyers willing to refer their clients to PBLSC for PDD procedures; in turn, PBLSC would receive a "Letter of Protection" ("LOP") from the law firm, which promised payment upon settlement of the personal injury claim. *Id.* at ¶ 40. PBLSC would perform the PDD and then provide medical records and billing information to the lawyers, who would use it in a settlement demand letter to the casualty insurer. *Id.*

ArthroCare began to employ this business model to boost sales of Spine Wands. *Id.* at ¶ 41. In late 2005, DiscoCare, Inc. ("DiscoCare") was formed as a distributor exclusively for ArthroCare Spine Wands. *Id.* at ¶ 41. DiscoCare was substantially intertwined with PBLSC and ArthroCare—for instance, Dr. Jonathon Cutler, a partner and physician at PBLSC, was the owner of DiscoCare; ArthroCare's Florida subsidiary (DRS) shared a fax number with DiscoCare (which ArthroCare executives later claimed was a "mistake" on the DiscoCare website); DiscoCare's functional address was the same as PBLSC's; and Denker, a former sales executive of ArthroCare in the Spine division, was the "Director" of DiscoCare and ran its daily operations. *Id.* at ¶ 42. However, ArthroCare officially referred to DiscoCare as a "third party biller" for Spine Wands, and claimed it was a wholly separate entity from ArthroCare. *Id.* at ¶ 42.

The relationship between DiscoCare, ArthroCare, PBLSC, and personal injury lawyers became known as the "DiscoCare Model." *Id.* at ¶ 43. The model essentially worked as follows: physicians

or surgical centers certified to perform PDDs would enter into relationships with personal injury lawyers whereby the lawyers would refer their personal injury clients to the physician and provide the physician with an LOP.  *Id.*  In turn, the physician would perform the PDD using Spine Wands from DiscoCare, which they got in exchange for the LOP (in lieu of paying for the Wand themselves).  Once the physician performed the PDD procedure, the physician would provide medical records and bills to the lawyers to use in a settlement demand letter to the casualty insurer.  Once the insurer settled, the lawyers, the physician, ArthroCare, and DiscoCare would be paid out of the settlement proceeds.  *Id.* By using the DiscoCare Model, ArthroCare was able to vastly increase the number of physicians and facilities using Spine Wands.  *Id.* at ¶ 46.

One of the keys to the DiscoCare Model was grossly inflated prices.  First, DiscoCare/ArthroCare grossly inflated the price of the Spine Wands sold through the DiscoCare Model: specifically, ArthroCare received $7,500 for a Spine Wand used in the DiscoCare Model versus a maximum of $1,400 for the same Spine Wand used in traditional PDD procedures.  *Id.* at ¶ 56. ArthroCare also apparently realized that if the physicians changed the CPT codes for the PDD procedure, they could vastly increase their charges for the procedure itself.[3]  *Id.* at ¶ 48.  Thus, under the DiscoCare Model, ArthroCare advised physicians to use CPT code 63056, which corresponds to an "open microdiscectomy"—a far more invasive and complicated procedure than a PDD procedure.[4] *Id.* at ¶ 51.  This practice is referred to as "upcoding."  Because the microdiscectomy is performed with an incision, ArthroCare began advising physicians the PDD procedure should be performed with the

---

[3]The American Medical Association provides a "CPT" code to all medical procedures, which describes the medical, surgical, and/or diagnostic service being performed, and quantifies the value of the procedure or service. Medicare and many private insurers associate relative payment amounts with each CPT code.

[4]The appropriate code for a PDD is 62287, which provides for a much smaller reimbursement.

use of a small incision (instead of through a needle), ostensibly to reduce the risk of infection. *Id.* at ¶ 52.

Plaintiff also claims ArthroCare improperly recognized revenue on sales to DiscoCare, which was a "straw man." Specifically, Plaintiff alleges that when ArthroCare sold Spine Wands to DiscoCare, the Wands stayed in ArthroCare's warehouse inventory until DiscoCare had an order from a doctor. DiscoCare would then provide the Wand to the doctor at no charge, and DiscoCare was not obligated to pay ArthroCare for the Wand until the personal injury lawsuit was resolved and it had collected on its LOP; otherwise, DiscoCare was not obligated to pay for the product. *Id.* at ¶¶ 72, 346. Notwithstanding these details, ArthroCare recognized revenue on sales to DiscoCare ***immediately*** upon the sales, while the products were still in its inventory, as if DiscoCare were a third-party customer purchasing products for resale. *Id.* at ¶¶ 73, 346.

As a result of the DiscoCare Model and the upcoding involved, Plaintiff claims the Spine division became ArthroCare's highest growth division. *Id.* at ¶ 70. But the revenue for the Spine division was artificially inflated through (1) ArthroCare's collusion with lawyers and doctors to create "an illicit market" for the Spine Wands; (2) the grossly inflated price of the Spine Wands and the PDD procedure charged to casualty insurers; and (3) the fact ArthroCare immediately recognized revenue on sales to DiscoCare, a "straw man." *Id.* at ¶ 72. According to Plaintiff, ArthroCare had essentially transformed a poorly selling $1,400 product into a $7,500 receivable to a personal injury attorney, paid for with an LOP, as part of a system to up-charge for minor procedures and defraud casualty insurers.

ii.    **DRS**

In 2007, ArthroCare expanded the DiscoCare Model to its Sports Medicine division by forming a wholly-owned subsidiary called DRS. *Id.* at ¶ 81. Defendant Raffle, the VP of Strategic Business Units for ArthroCare, was also the President, Treasurer and Sole Director of DRS. *Id.* DRS shared the

same fax number as DiscoCare, and although the DRS website claimed it was based in Sanford, Florida, it was actually housed in the Austin, Texas offices of ArthroCare. *Id.* at ¶ 282. Before 2008 (when ArthroCare began to face questions from the media about DRS), ArthroCare had ***never*** mentioned DRS in any public filings or conference calls, and the DRS website and promotional materials made absolutely no mention it was owned by ArthroCare. *Id.* at ¶ 287. The purported function of DRS, according to ArthroCare, was to specialize in medical device reimbursement, and work directly with insurance groups on ArthroCare's behalf. *Id.* at ¶ 81. The DRS model consisted of four steps: (1) the customer ordered the device through DRS and was billed at the facility's negotiated price; (2) the customer completed the procedure using the ArthroCare device and sent all insurance paperwork to DRS; (3) DRS submitted the bill to the insurance company for reimbursement; and (4) the customer received a rebate quarterly for all products successfully reimbursed. *Id.* at ¶ 81.

However, DRS used various improper practices to increase revenue. First, DRS improperly double-billed insurance companies by unbundling the cost of the medical device used from the reimbursement amount for the procedure, which is not allowed for disposable medical devices. *Id.* at ¶¶ 83-84. Under this unbundling scheme, doctors did not have to pay for ArthroCare's disposable medical devices out of the reimbursement proceeds they received from insurance companies; instead, DRS was claiming that amount from insurers separately. *Id.* at ¶ 85. Secondly, ArthroCare increased the prices of the medical devices sold by DRS by 100% or more. DRS would allow the doctor to use the device for free, the doctor would sign a receipt for the device and send the receipt to DRS, and DRS would get reimbursed by the insurance company for the marked-up price. *Id.* at ¶ 86. Third, DRS employees were coaching physicians to falsely claim they had performed procedures at hospitals or surgery centers rather than at the doctor's office because reimbursements are higher for procedures performed at hospitals and surgery centers. *Id.* at ¶ 87. Finally, ArthroCare improperly recognized

revenue on sales made by DRS: ArthroCare billed DRS as if it were a separate entity (although it was

a subsidiary) and *immediately* recognized revenue on sales made by DRS, despite the fact the sales

were contingent in nature, as DRS was paid by the insurers, not the doctors performing the procedures,

and those payments were not guaranteed.  *Id.* at ¶ 88.

      **B.**       **Revenue Recognition Practices**

      The other major scheme Plaintiff alleges ArthroCare engaged in was a scheme to improperly

recognize revenue on products sold to distributors and customers by, for instance, (1) improperly

allowing returns and exchanges contrary to company policy; (2) shipping non-conforming goods; (3)

splitting a single purchase order into multiple smaller orders for the specific purpose of recognizing

revenue in multiple periods; (4) selling to customers without sufficient evidence collectability was

reasonably assured; and (5) shipping products in advance of the due dates identified in purchase orders.

      According to Plaintiff, ArthroCare frequently engaged in quarter-end transactions with some

of its largest distributors—Borrachia and SOTA, among others—that were structured to manipulate

yearly earnings, in order to meet (but not exceed) announced targets.  *Id.* at ¶ 90.  Several confidential

sources claim ArthroCare typically received large orders from Borrachia, SOTA, or DiscoCare on the

last day of the quarter.  *See, e.g. id.* at ¶ 92.  Once ArthroCare hit its quarterly targets, ArthroCare

management would direct employees to stop entering or post-date these orders (and therefore move

them to the following quarter), essentially telling them "when to cut it off."  *Id.* at ¶¶ 93, 94, 98.

ArthroCare supplemented this with a very "loose" return policy, permitting large returns freely once

the new quarter started.  *Id.* at ¶¶ 100-01.  Borrachia and SOTA were apparently told that if they took

non-conforming products they could return them in the following quarter in exchange for the ones they

really wanted.  *Id.* at ¶ 101.  In this way, the distributors placed huge orders at the quarter's end, and

freely returned anything they did not want before the invoice was due.  *Id.* at ¶ 106.  Confidential

witnesses cited by Plaintiff believe these were "false orders" submitted solely to meet quarter-end goals. *Id.* at ¶ 113.

## III.   The Restatement

In December 2007, ArthroCare began to face increasing questions in the media about its close relationship with DiscoCare and the legitimacy of that business. *See id.* at ¶¶ 260-267.  For instance, on December 11, 2007, the *New York Post* ran an article questioning whether ArthroCare had a relationship with DiscoCare unbeknownst to the investing public. *Id.* at ¶ 260.  Similar articles were also published on December 14, December 17, December 20, and December 27. *Id.* at ¶¶ 261-67.  In January 2008, ArthroCare responded by announcing it had bought DiscoCare for $25 million (from Dr. Cutler). *Id.* at ¶ 268.

However, questions continued and soon began to center around DRS as well, which appeared to be offering the same billing/coding facilitation for the Sports Medicine division as DiscoCare did for the Spine division. *See, e.g. id.* at ¶ 282.  The media also uncovered, among other things, ArthroCare sales training documents that clearly showed the manner in which ArthroCare had coached doctors on how to code for PDD procedures, and DRS documents with various inaccuracies (such as one that claimed DRS had been a "national provider" for "more than 10 years," when it was undisputed DRS was actually established in 2007). *Id.* at ¶ 283.  The media barrage continued through the spring of 2008. *Id.* at ¶¶ 286-304.

On May 30, 2008, PwC's general counsel's office received a series of anonymous faxes which contained substantially the same allegations as the press reports, specifically focusing on the "accounting for and disclosure regarding transactions involving DiscoCare and other distributors as well as alleged insurance practices and related healthcare regulatory compliance issues." *Id.* at ¶ 324 (quoting the Restatement).  ArthroCare claims that in response to these faxes and following discussions

with PwC, it began a "reassessment" of the accounting for its relationship with DiscoCare and other customers.  *Id.*

Following the reassessment, ArthroCare announced on July 21, 2008 that it would be restating financial results from the third quarter of 2006 through the first quarter of 2008 due to material errors, and would also be reviewing internal controls.  *Id.* at ¶ 305.  The press release admitted "the relationship between [ArthroCare] and DiscoCare during the periods being restated was a sales agent relationship, rather than that of a typical distributor," and that the sales price of products sold to Borrachia, SOTA, and Clinical Technology, Inc. "cannot be considered fixed or determinable upon shipment by ArthroCare during the period being restated."  *Id.*  ArthroCare stated it would be accounting for those sales using a "sell-through" revenue recognition method rather than a "sell-in" method.[5]  *Id.*  On July 24, 2008, ArthroCare issued a press release stating the SEC was conducting an informal inquiry into accounting matters at ArthroCare.  *Id.* at ¶ 307.

On December 19, 2008, ArthroCare revealed the Restatement would be much larger in size and scope than previously indicated.  *Id.* at ¶ 312.  ArthroCare conceded it had identified accounting errors and irregularities, and the transactions that were improperly accounted for were "primarily quarter-end transactions and were frequently structured in an effort to meet revenue forecasts."  *Id.* at ¶ 312.  ArthroCare stated the errors identified principally involved "the timing of revenue recognition, including reductions in revenue due to customer return rights that previously should have prevented revenue from being recognized upon shipment, inability to demonstrate collectability of customers' orders upon shipment, and product shipments in advance of requested delivery dates."  *Id.*  ArthroCare also stated:

---

[5]Under a sell-through method, revenue is not recognized until ***after*** a surgery is performed or a subsequent sale to another customer occurs.  *Id.*

> Facts identified in the Review indicate that actions employed by senior sales management, including [Raffle] and [Applegate], primarily led to the accounting errors and possible irregularities now being considered as part of the Company's restatement. Those actions included failing to communicate and/or withholding key information and practices bearing on revenue recognition and other accounting issues to [the accounting staff or PwC].

*Id.*

Also in the December 19 announcement, ArthroCare announced the resignation of Defendant Gluk as CFO, and the resignation of Defendants Raffle and Applegate from their respective positions. *Id.* at ¶¶ 21-22.  It also announced it had "discontinued the practice of providing devices at no charge in exchange for a letter of protection in personal injury cases," that  it was eliminating DiscoCare, "which primarily focused on the letter of protection aspect of the business," and that it had begun the process of closing DiscoCare's facility in Florida.  *Id.*

On February 18, 2009, ArthroCare again expanded the scope of the previously-announced Restatement, and announced the resignation of Defendant Baker as CEO.  *Id.* at ¶ 316.  ArthroCare stated it had found evidence the Spine division had engaged in and caused others to engage in improper practices by: (1) "seeking separate reimbursement from insurers for [ArthroCare] products in connection with procedures which were contractually reimbursed on a global basis [*i.e.*, unbundling];" (2) "making inaccurate statements in claims submitted to insurers regarding the place where particular procedures were performed;" (3) "providing physicians and insurers with descriptions of [ArthroCare] technologies which had the effect of circumventing payor policies that did not cover such technologies;" and (4) "recommending and advocating to physicians the use of a [CPT] code to identify [Spine Wand] technology that was not approved by the American Medical Association and may not have properly described the procedure that was performed."  *Id.*  ArthroCare admitted these practices may have been going on since at least 2006.

Also in the February 18 announcement, ArthroCare admitted it was under investigation by U.S. Attorney's offices in South Carolina and Florida in connection with DiscoCare, and revealed the SEC investigation had been upgraded from informal to formal.  *Id.* at ¶ 512.

Finally, on November 18, 2009, ArthroCare released the Restatement.  *Id.* at ¶ 318.  The Restatement reduced total revenue for the years 2007, 2006, 2005 and 2004 by approximately 12.4%, 7.3%, 4%, and 1%, respectively, and decreased net income in 2007 by 98.9% (from $43.2 million to $0.4 million), in 2006 by 12.6% (from $31.7 million to $27.7 million), and in 2005 by approximately 19%.  *Id.* at ¶¶ 319, 8.  According to the Restatement, ArthroCare's internal review had focused on two areas: accounting issues and internal controls, and insurance billing and healthcare compliance issues. *Id.* at ¶ 324.  With respect to "healthcare compliance," ArthroCare admitted it had uncovered numerous issues including, *inter alia*, (1) billing and coding "inaccuracies" by DRS and DiscoCare in bills submitted to insurance companies; (2) improperly advising healthcare providers to upcode CPT codes in ways not approved by the American Medical Association which may have been improper; and (3) improperly providing "free goods, services, or inappropriate discounts to customers in connection with their use of [ArthroCare's] products," which may have occurred since 2006.  *Id.*

With respect to accounting issues, ArthroCare admitted the review had uncovered numerous GAAP violations:

> ...[that] included, but were not limited to: deviating from existing revenue recognition policies developed for sales to a particular distributor; requesting or allowing returns and exchanges contrary to our policy; encouraging distributors to place orders while knowing of the distributor's heightened inventory level; shipping nonconforming goods; splitting a single purchase order into multiple smaller purchase orders for the specific purpose of recognizing revenue in multiple periods; selling to customers without sufficient evidence that collectability of the related receivable was reasonably assured; and shipping product in advance of due dates identified in our purchase orders.

*Id.* at ¶ 325.  The Restatement continued, "A former executive of ours had responsibility for sales and revenue in each of our business units and was involved in the majority of transactions that were identified in the Review." *Id.*  The Restatement indicated sales personnel involved in the transactions at issue, and even a former executive officer, had failed to communicate information and practices bearing on revenue recognition to ArthroCare's finance personnel and/or PwC, and in at least one instance affirmative misrepresentations were made by a former executive officer to ArthroCare's Vice President of Finance.  *Id.*

The Restatement also admitted ArthroCare had—improperly and in violation of GAAP—recorded revenue on sales of devices to DiscoCare and DRS, and had improperly accounted for the acquisition of DiscoCare by not recognizing a loss of approximately $25 million as of the acquisition date (but rather allocating the purchase price to acquired assets and goodwill). *Id.* at ¶¶ 225, 326.   ArthroCare acknowledged its internal controls were not effective during the time period in question.  *Id.* at ¶ 327.

On the day of the Restatement (February 18, 2009) ArthroCare's stock price closed at $4.50 per share, down from a high during the Class Period of $65.70 (on November 1, 2007).  *Id.* at ¶ 8.

## Analysis

I.     **Defendant Michael Baker's Motion to Dismiss [#172] and Defendant Michael Gluk's Motion to Dismiss [#169]**[6]

Baker alleges the CCAC fails to adequately plead falsity and scienter, and thus the claims asserted against Baker under § 10(b) and Rule 10b-5 should be dismissed.  Gluk asserts, similarly, that

---

[6]The motions to dismiss filed by Baker and Gluk are considered together because there is substantial overlap between them, especially in the discussion of scienter.  Where the discussions relate only to one of the Individual Defendants, it is specifically stated.

the CCAC fails to adequately plead scienter and loss causation, and thus should be dismissed.  The Court will consider these contentions in turn.

### A.    Legal Standard for Dismissal

To state a cause of action under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a misstatement or omission, (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury."  *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).  A § 10(b) claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled "with particularity" and the requirements of the PSLRA.  *Abrams*, 292 F.3d at 430.

The PSLRA "was enacted in response to an increase in securities fraud lawsuits perceived as frivolous."  *Newby v. Enron Corp.*, 338 F.3d 467, 471 (5th Cir. 2003).  The PSLRA enhanced the particularity requirements for pleading fraud under Rule 9(b) in two ways.  *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).  First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading[,]" 15 U.S.C. § 78u-4(b)(1)(B), and secondly, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The Fifth Circuit has found the requirements of the PSLRA comport with those of Federal Rule of Civil Procedure 9(b), which "requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  In short, "the who, what, when, and where must be laid out before access to the discovery process is granted." *Id.*  A district court must dismiss a securities fraud claim failing to satisfy either the PSLRA's pleading

-14-

requirements or those of Rule 9(b).  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (internal quotes omitted).

### B.      Falsity

First, Baker claims Plaintiff has failed to identify each specific statement it claims was false and explain why it was false when made—in other words, it has failed to set out the specific misrepresentations or omissions made by the Individual Defendants.  Again, under the PSLRA and Rule 9(b)'s heightened pleading instructions, any private securities complaint alleging the defendant made a false or misleading statement must specify ***each*** statement alleged to have been false or misleading and the reason or reasons why the statement was false or misleading when it was made.  15 U.S.C. § 78u-4(b)(1).  If an allegation regarding the statement or omission is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *Id.*

Baker (adopting the argument of ArthroCare in its motion to dismiss) complains the CCAC simply sets forth block quotes from over 100 pages of ArthroCare's various press releases or investor calls, but does not identify which statements in the block quotes are allegedly false, or why the statement was false when made—it simply lumps together all the statements in a release or call and asserts they were all false when made.  *See* Baker's Mot. Dismiss at 7-8; Arthro.'s Mot. Dismiss at 5-7.[7] ArthroCare acknowledges the Restatement may be sufficient to show the restated financial information was false when published; however, it claims the Restatement does not establish the falsity of any other statements (such as non-financial information).  Arthro.'s Mot. Dismiss at 7.  Because the block quotes include information that was not changed by the Restatement, ArthroCare claims Plaintiff cannot

---

[7]Because Baker specifically adopts the arguments of ArthoCare's motion to dismiss on the issue of falsity, the Court will consider both ArthoCare's and Baker's contentions in its analysis of this issue.  *See* Baker's Mot. Dismiss at 7.

simply rely on the Restatement as a whole to establish every public statement by ArthroCare was false. *Id.*

Plaintiff responds that in cases such as this one—where there is a major restatement spanning a long period of time, multiple federal investigations, and resignations of all the individual defendants from the company—other district courts have found a company's restatement is a sufficient basis for pleading its public filings from the relevant period were false when made. *See, e.g. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006) (finding the plaintiff had sufficiently pled falsity because the company's "announcement of the need to restate its earnings constitutes an admission that its public filings are false."). The Court agrees with Plaintiff the Restatement may show the falsity of prior information, even non-financial information. Although ArthroCare ignores this fact, much of the Restatement actually does deal with non-financial information—it goes far beyond simply adjusting the relevant earnings numbers. For instance, although Baker repeatedly stated publically that ArthroCare "do[es] not tell [physicians providing PDDs] how to code," *see, e.g.* CCAC at ¶ 275, this statement was specifically acknowledged to be incorrect in February 2009, when ArthroCare admitted its Spine division had engaged in "recommending and advocating to physicians the use of a [CPT] code to identify [the Spine Wand] technology that was not approved by the American Medical Association and may not have properly described the procedure that was performed." *Id.* at ¶ 316.

Thus, it appears to the Court there is no question Plaintiff has successfully plead falsity in the CCAC, as the sweeping Restatement filed by ArthroCare operates as an admission its public filings from 2004 through the first quarter of 2008 were false in many material respects. Plaintiff has

specifically identified all of Baker's and Gluk's statements during the Class Period which it claims were false or misleading, and has alleged they were false or misleading when made and the reasons therefor. *See* CCAC at 44-158 (section entitled "The False Statements Made During the Class Period").

The Court acknowledges the point made by Mr. Brownlie at the hearing, that in the section of the CCAC entitled "The False Statements Made During the Class Period," Plaintiff has simply copied the text of various of ArthroCare's public filings and press releases and set them forth in lengthy block quotes, without identifying *particular* statements as false or misleading, or stating the reasons for the falsity of those statements.[8]  But the reason for this is relatively simple: most of Plaintiff's falsity allegations are centered around the major allegation that the Individual Defendants failed to disclose and omitted certain material information in public filings and press releases from the first quarter of 2005 through the first quarter of 2008.  Because much of the CCAC necessarily rests on the fact Baker and Gluk *omitted* crucial information, it is logical that in many instances Plaintiff set forth the relevant portions of a press release or investor call *in toto*, in order to give an idea of what was said and, just as importantly, what was omitted.  Plaintiff does not appear to be hiding behind the lengthy block quotes to avoid making itself abundantly clear on the issue of falsity (which would be improper); instead, it uses the block quotes to put its allegations of material omissions in context.

Furthermore, in the portions of the CCAC in which Plaintiff makes allegations about affirmative misrepresentations (as opposed to omissions), Plaintiff clearly sets forth the false statements and the reasons why such statements were false when made.  *See, e.g.* CCAC at ¶ 261 ("When questioned about this potential relationship [between DiscoCare and ArthroCare], Baker responded with the following statement quoted in the article, '[t]his information stems from rumors being spread by hedge funds that

_____

[8]The Court notes for the record that despite his protestations, Mr. Brownlie conceded at the hearing that this deficiency is by no means fatal to Plaintiff's claim, and that re-pleading could likely cure the "deficiency" he identifies.

have neither ArthroCare's shareholders' or patients' best interests at heart.' This statement by Baker was false. As alleged below, the Restatement revealed that at this point in time DiscoCare was in fact ArthroCare's undisclosed sales agent with substantial ties to ArthroCare, and rather than being 'rumors,' the information in the article Baker was referring to has been shown to be true."). Thus, although Mr. Brownlie's point is well taken, the Court finds falsity is sufficiently alleged in the CCAC, and DENIES Baker's motion to dismiss on this ground.

C.     **Scienter**

Secondly, both Baker and Gluk argue the facts pled in the CCAC do not give rise to a strong inference of scienter on his part, as is required by the PSLRA. The Court does not fully agree.

Section 10(b) and Rule 10b-5 require proof the defendant acted with "scienter"—*i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Both intent and "severe recklessness" are sufficient to satisfy the substantive scienter requirement. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407-08 (5th Cir. 2001). Severe recklessness is not mere negligence, but is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and present a danger of misleading...which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 408. Under the PSLRA, a complaint must "state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind" in order to avoid dismissal. 15 U.S.C. § 78u04(b)(2) (emphasis added); *Tellabs*, 551 U.S. at 313.

The Supreme Court has detailed a three-step process for reviewing allegations of scienter on a motion to dismiss pursuant to the PSLRA. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing *Tellabs*, 551 U.S. at 322-23). First, the

facts alleged in the complaint are to be taken as true.  *Id.*  Second, those facts must be considered holistically, rather than in isolation, to determine whether scienter has been properly pled, as the proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23.  Finally, in determining whether the pleaded facts give rise to a "strong" inference of scienter,  the court must take into account plausible opposing inferences.  *Indiana Elec.*, 537 F.3d at 533 (citing *Tellabs*, 551 U.S. at 523). "[T]o qualify as 'strong'... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  The inference of scienter need not be irrefutable, but it must be strong in light of other explanations.  *Id.*

No direct allegations of fraudulent conduct or intent on the part of Baker are alleged in the CCAC.  Instead, Plaintiff relies—as it is permitted to do—on circumstantial allegations.  *Indiana Elec.*, 537 F.3d at 535.  Although the Court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically," *Tellabs, Inc.*, 551 U.S. at 326, the Court has broken the allegations down into the following categories for convenience of discussion.

### i.    Red flags in the media

First, Plaintiff argues the "red flags" that began appearing in the media in December 2007 should have put Baker on notice of the alleged fraud; thus, it can be inferred from the fact that he publically continued to deny and downplay the fraud and accounting errors that he either knew he was making misstatements of fact or was severely reckless in making the statements.  For instance, a Florida district court, considering whether scienter had been adequately pled where the plaintiffs alleged the individual defendants had been confronted by red flags in the media regarding their improper practices, stated:

[T]he Complaint also alleges that Dunlap and Kersh were confronted by the financial media about improper accounting and financial reporting practices.  For example, in June 1997, *Barron's* published an article which stated the possibility that Sunbeam was engaging in accounting and inventory fraud.  Sunbeam strongly denied these allegations and Dunlap flatly rejected them as propaganda stirred up by "shorts". ***These denials indicate that Dunlap and Kersh were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial.***  As such, Sunbeam's and Dunlap's denials demonstrate, at a minimum, extreme recklessness on the part of Kersh and Dunlap.

*In re Sunbeam Secs. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (emphasis added); *and see Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("defendant's attempts to mollify public doubt about [the corporation's] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] shows the defendants acted with knowledge[.]").  Likewise, in *In re Spear* a district court held the defendant CEO should have grown suspicious of earnings and investigated when he was faced with the "significant red flag" of an article critical of accounting irregularities at the company; however, "instead of investigating when confronted with the article's allegations, [the CEO had] flatly rejected them as 'malicious comments' and 'misstatements, mischaracterizations, and distortions.'"  399 F. Supp. 2d 1350, 1358-59 (S.D. Fla. 2005).  The *In re Spear* court found the fact the CEO had issued such a denial indicated he was either familiar with the facts or reckless in denying the allegations without sufficient knowledge of the situation.  *Id.* at 1359.  This, coupled with motive and opportunity allegations, was sufficient to give rise to a strong inference of the requisite scienter on the part of the CEO.  *Id.* at 1359.

Essentially, the evidence of red flags in this case boils down to the specific assertion that after December 2007, Baker and Gluk were directly confronted by the financial media with evidence of various fraudulent practices at ArthroCare.  Nonetheless, Baker continued to reassure investors the reports were lies, rumor-mongering, and propaganda by short sellers for some six months after they were published, and Gluk (by his silence) allowed these misrepresentations.  The media reports began

-20-

with a *New York Post* article on December 11, 2007, which questioned the relationship between ArthroCare and DiscoCare and detailed the numerous connections between the two companies and the PBLSC.[9]  CCAC at ¶ 260.  The article discussed the fact that DiscoCare was able to get "upward of 50 percent" approval for procedures using ArthoCare products, whereas medical office staff had a 15 percent approval rate for the same procedures.  *Id.*  The article pointed out that according to a help-wanted ad recently listed by ArthroCare, a key aspect of DiscoCare's business model was "developing a network of personal injury lawyers willing to refer their clients to DiscoCare for treatment under the 'DiscoCare Model.'"  *Id.*

On December 20, 2007, an article (aptly titled "Red Flags at ArthroCare") discussed in detail the DiscoCare model, alleging it relied upon insurance fraud and upcoding to artificially inflate revenue. *Id.* at ¶ 265. On December 27, 2007, a Citron article authored by Andrew Left discussed the possible motivation for the "aggressive billing procedures" in ArthroCare's Spine Division, stated that the "DiscoCare/ArthroCare relationship [is] too close for comfort," and claimed Discocare was "coaching, advocating and incenting [sic] doctors to" commit insurance fraud by upcoding. *Id.* at 267.  The article closed by asking "Is ArthroCare helping to facilitate upcoding and taking on financial risks for doctors—a serious no-no in the healthcare supply market?"  *Id.*

Although these articles alleged in substantial detail many of the fraudulent practices ArthroCare later admitted, Plaintiff allege Baker continued to fraudulently deny the fraud and reassure investors with misrepresentations after the articles began to surface.  For instance, in response to the *New York Post* article, Baker made the statement (which was published in the article): "[t]his information stems

---

[9]Although Baker claims in his reply that the *New York Post* article was not entirely true, and therefore cannot constitute a red flag, *see* Baker's Reply at 3-4, the only inaccuracies he identifies in the article are (1) the fact it stated the Massachusetts Attorney General was investigating ArthroCare, although this statement was later withdrawn, and (2) the fact it apparently misrepresented publically-available information regarding Mr. Baker's stock sales. *Id.* However, Baker admits the other statements in the article—which constitute the large majority of it—"were correct." *Id.*

from rumors being spread by hedge funds that have neither ArthroCare's shareholders' or patients' best interests at heart." CCAC at ¶ 261.

Likewise, Baker and Gluk hosted an analyst conference call on January 3, 2008, almost a month after the first reports of fraud surfaced in the media, during which Baker repeatedly referred to DiscoCare as a "third-party" company, and to the DiscoCare model as "a highly disciplined treatment algorithm that we believe is the key to successful authorization[.]"[10]  CCAC at ¶ 270.  Baker stated that during the acquisition due diligence for DiscoCare they had "found no evidence that PDD is being used overly aggressively or inappropriately by any of our customers who follow the DiscoCare treatment algorithm," and "DiscoCare does an excellent job of ensuring that the algorithm is followed."  *Id.*  He specifically represented "[DiscoCare] do[es] not code procedures for physicians, hospitals, or other facilities.  There are some third-party billing firms who provide these billing services for...fees, but DiscoCare is not one of them."  *Id.*  He referred to the stories in the media as "rumor-mongering," stating they were "not true."  *Id.*  When taking questions, he repeated "we don't code for physicians.  We don't code for facilities....  We don't code for surgeons....  We don't code for hospitals.  And we don't tell them how to code...  The surgeon with his facility decides what...CPT code is appropriate[.]"  *Id.* at ¶ 271.  He represented, "The only thing we're doing now I suppose that is different is that we're being much more systematic in organizing those cases to make sure that the proper diagnostic algorithm is followed[.]"  Baker specifically explained the DiscoCare model as follows:

> Here is how the model works.  When they get preapproval for a case and the case is scheduled, they would then call us and say, we have preapproval for a case.  Sell us a wand.  And we would sell the wand to DiscoCare at our contract price, and the case would be done, and then DiscoCare would submit the bill for the wand to the insurance company under the preapproval.  And then DiscoCare would eventually get paid by the insurance company.  And so that—it is as simple as that.

---

[10]Plaintiff alleges DiscoCare did not use any sort of algorithm in obtaining authorizations; instead, its success was in its use of the DiscoCare Model, which included insurance fraud, upcoding, and increased prices.

*Id.*

Plaintiff claims the foregoing were false statements by Baker because DiscoCare ***did*** tell health care providers how to code (as ArthroCare later conceded), and DiscoCare was ***not*** a third-party company, but was in fact ArthroCare's undisclosed sales agent with substantial ties to ArthroCare (as ArthroCare later conceded). Plaintiff claims Baker also wholly failed to disclose that the DiscoCare model employed numerous improprieties and improperly advised the use of incorrect CPT codes. *Id.* at ¶ 277.

Similarly, on January 23, 2008 an article was published which contained allegations about DRS, stating it was offering the same billing/coding facilitation for the Sports Medicine Division as DiscoCare was offering for the Spine Division, and was run by John Raffle, the Vice President of ArthroCare's Strategic Business Unit. *Id.* at ¶ 282. The article pointed out that DRS shared a fax number with DiscoCare and was operated out of the Austin, Texas offices of ArthroCare (although it purported to be located in Sanford, Florida). *Id.* at ¶ 283. With respect to DiscoCare, the article mentioned documents that clearly set forth the manner in which ArthroCare had coached doctors on how to code for PDD procedures. *Id.* The article referenced the fact Baker had stated in a January 18, 2008 conference call with Bear Stearns, "We keep scratching our heads, wondering what the next improbable story will be." *Id.* Plaintiff claims this statement by Baker was false and misleading when made because the Restatement would later reveal that at this point in time, "DiscoCare was in fact ArthroCare's undisclosed sales agent with substantial ties to ArthroCare, and rather than being an 'improbable story,' the information in the article Baker was referring to has been shown to be true.'" *Id.* at ¶ 284.

A January 24, 2008 article published by Citron stated that despite opportunities to tell the truth, ArthroCare management had continually lied to investors and analysts about key issues. *Id.* at ¶ 286.

The article stated ArthroCare shareholders had never heard of DRS until the day before, and the DRS website and promotional materials went to great lengths to disassociate DRS from ArthroCare, even stating DRS was based in Sanford, Florida. *Id.* at ¶ 287. The article questioned whether DRS was a third-party biller, and noted that DRS materials stated it had been in business for "over 10 years," when in reality it was established in 2007. *Id.* at ¶ 288. The article also discussed the fact that ArthroCare documents indicated ArthroCare had increased the price of its SpineWand from $1,200 to $7,500 without any apparent reason for the significant price increase. *Id.* at ¶ 289. It noted the same type of activity was then occurring in the Sports Medicine Division, with prices being increased by as much as 100%. *Id.* The article attached numerous documents presented at an ArthroCare sales meeting (specifically entitled the "Nikki Bryant Training Materials"), which made it clear (1) "ArthroCare does teach doctors how to code—in direct contradiction of CEO Baker's vehement assertions to the contrary," (2) "[t]he coding scheme (CEO Baker misleadingly calls it an 'algorithm') was established by the Palm Beach Surgical Center," (3) "[t]he costs associated are so high that the sales rep actually has to carry around a WC authorization because physicians are incredulous at how high the fees are[,]" and (4) "they stress the importance of relationships with personal injury attorneys." *Id.* at ¶ 290. According to Citron, the documents showed the law firms were identifying personal injury clients who were candidates for the PDD procedure, and were the ones paying for the Spine Wands. *Id.* at ¶ 291. The article noted the fax number listed for DRS on its website had been the same number as DiscoCare's fax number for months, but had been changed within hours of the article published the previous day, which had pointed this out. *Id.* The article concluded, "The documents all have one common theme. ArthroCare has now come to the realization that if they can control the billing, they can control the pricing. All of this comes at the expense of insurance companies[.]" *Id.*

On January 28, 2008, "Seeking Alpha" issued an article entitled "Analysts Continue Defying Logic with ArthroCare Defense," in which it stated, *inter alia*, that it was clear the controversy surrounding ArthroCare was not limited to its Spine Division, but had spilled over into the Sports Medicine Division. *Id.* at ¶ 292. The article stated the proper coding for the PDD procedure appeared to be 62287, and although ArthroCare continued to deny coaching doctors on coding, documents from ArthroCare's 2007 sales meeting proved otherwise. *Id.* at ¶ 293. For instance, one slide from the meeting stated that ArthroCare "look[s] for physicians open to [using code] 63056 and looking for an increase in profitability," and a document setting forth "frequently asked questions" about DiscoCare spelled out that the sales representative should try to convince doctors not to use a SpineWand they already have in stock because "[i]f they use their wand we can't create a bill-only form and DiscoCare can't submit a reimbursement claim." *Id.* The January 28 article also discussed the debate over ArthroCare's DRS subsidiary, and how ArthroCare's management had gone out of its way to hide it. *Id.* at ¶ 294. It noted ArthroCare had raised prices on a mature product line by over 100% within a two-month time span, with no plausible justification other than that the business model was put in place to manipulate the insurance system and provide a source for funds for "rebates." *Id.*

The CCAC alleges Baker was again confronted with evidence of the previously-undisclosed or downplayed relationship between ArthroCare, DiscoCare, and DRS in a February 19, 2008 conference call. When asked about the fact DiscoCare and DRS had shared a fax number for some six months *before* ArthroCare had acquired DiscoCare as a subsidiary, Baker stated "it was just a mistake on the website." *Id.* at ¶ 296. When pressed, he continued "The same people developed the website for DRS that developed the website for DiscoCare, and they just put the wrong fax number on it." *Id.* Plaintiff alleges these statements made during the February 19 conference call were false and misleading and are an indication of scienter because DiscoCare had in fact been ArthroCare's

undisclosed sales agent, with substantial ties to ArthroCare, and Baker was continuing to cover this up despite the detailed evidence to the contrary that was appearing in the media. *Id.* at ¶ 297-98. Throughout July of 2008, the media continued to publish articles about the improper practices at ArthroCare, which became successively more detailed. *See id.* at ¶¶ 299-305. ArthroCare did not reveal the truth, even in part, until July 21, 2008. *Id.* at ¶ 305.

Based on the foregoing, Plaintiff essentially alleges Baker recklessly disregarded blatant evidence of ArthroCare's accounting irregularities, and particularly the problems with DiscoCare and DRS involving insurance fraud, upcoding, and improper accounting. These irregularities indicated ArthroCare's financial statements were not and could not have been truthful, but Baker continued to defend them stridently and deny the allegations, making material misstatements and omissions in his statements and releases denying the allegations and defending the company. Plaintiff is correct that Baker can be liable for making both misrepresentations and omissions, as long as they were made with scienter. The Fifth Circuit has long recognized that under Rule 10b-5 "a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1990); *See also In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (disclosure under Section 10(b) "is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). Thus, where a defendant voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth, and disclose "material, firm-specific adverse facts that affect the validity or plausibility" of his statement or prediction. *Id.*; *Kurtzman v. Compaq Comp. Corp.*, 2000 WL 34292632 at *22 (S.D.Tex. 2000) (holding that because the defendants "voluntarily chose to speak publicly," they "therefore had a duty to tell the whole truth about [the company]'s financial condition.").

In the case of Gluk, the CCAC does not allege any specific misstatements or reassurances by him personally after December 2007; instead, it focuses on the fact he was included in the conference calls during that period and yet chose to remain silent while Baker made misrepresentations and omitted material information.  Gluk argues the news articles cannot give rise to any inference of scienter on his part because he was "not under a duty to investigate the news articles" or "to respond to every potentially disparaging news story or rebut the musings of the financial press."  Gluk's Reply at 2 (citing *Plumbers and Steamfitters Local 773 Pension Fund v. Can. Imp. Bank of Comm.*, 2010 WL 961496 at *11 (S.D.N.Y. 2010)).  But, as stated above, the fact Baker and Gluk held conference calls in which they addressed the news reports and denied the veracity of the reports means that there concomitantly arose a duty "to speak the full truth," and "disclose a 'mix of information' that [was] not misleading."  *Lormand*, 565 F.3d at 248-49; *Rubinstein*, 20 F.3d at 170.  In other words, neither Gluk nor Baker was "obligated to respond to every potentially disparaging news story," but once they did take it upon themselves to respond to the news stories, they were required to speak the full truth and accurately inform, rather than mislead, investors.

Furthermore, the fact Gluk did not personally address the news stories in public does not mean the denials cannot add to an inference of scienter on his part, as he was undisputedly present and had the opportunity to correct Baker at the time Baker was making the inaccurate and misleading statements to the investing public.  The situation is analogous to that presented in *Barrie v. Intervoice-Brite, Inc.*, in which the plaintiffs argued that the defendants could be liable for their omission in failing to correct a falsehood because they had silently listened as others made statements that they knew were false.  397 F.3d 249, 262 (5th Cir. 2005).  Essentially, the plaintiffs argued "that whether a particular statement during a conference call or a road show was uttered by [one individual defendant] or [another], both are liable: one for the utterance, and the other for the omission in failing to correct the falsehood."  *Id.*

The Fifth Circuit agreed, finding fraud is specifically pled with respect to each defendant as long as it is "pled with specificity that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant spoke and which defendant failed to speak[.]" *Id.* The *Barrie* court concluded, "a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context." *Id.* at 262 (quoting *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000)).[11]

In this case, because the CCAC sets forth detailed allegations showing that from December 2007 until May 2008 there were substantial red flags which should have alerted the Individual Defendants to the fraud that was later the subject of ArthroCare's Restatement, the Court finds a compelling inference of scienter is raised on the part of Baker with respect to any misstatements he made after December 2007, most of which are referenced above, and on the part of Gluk for any misstatements made by Baker in his presence which he knowingly failed to correct. The media reports detailed with striking specificity some of the major improprieties at ArthroCare, and were based on publically available information which would have been readily available to Baker and Gluk.[12]

_____

[11]The Fifth Circuit found this holding did not conflict with the ban on group-pleading under *Southland*, discussed *infra*, *id.* at 262-63, and this Court agrees.

[12]Gluk argues in passing that the CCAC "has not alleged that Gluk even read the articles in question." Gluk's Reply at 3. This argument is wholly without merit. Based on the fact Gluk hosted conference calls with Baker during which Baker made misrepresentations and omissions in an attempt to address the articles in question, it can be assumed Gluk had read or was familiar with the content of the articles (or was severely reckless in not doing so). For instance, Plaintiff alleges Gluk participated in the January 3, 2008 conference call, in which Baker specifically referred to some of the articles that had already been published and stated he hoped his statements on the call "would bring this rumor-mongering to a close," but that he "was reasonably certain [there would] probably be another story of some kind." CCAC at ¶ 270. Baker continued, "[s]o unfortunately all of you may have to listen to some other improbable stories in the coming days. . .[b]ut if that happens, please remember it is coming to you from the same people who told you so many other stories that turned out not to be true[.]" *Id.* The idea that Gluk, who hosted this call along with Baker and was the CFO of the company, would support these statements without having any idea of what the articles or "stories"

Nonetheless, Baker made several specific denials and misrepresentations (which Gluk failed to correct)—most notably, his statements in the January 2008 conference call, in which he (1) repeatedly referred to DiscoCare as a "third-party" company, and to the DiscoCare model as "a highly disciplined treatment algorithm" (although Plaintiff claims DiscoCare did not use any sort of algorithm in obtaining authorizations), (2) stated he had "found no evidence that PDD is being used overly aggressively or inappropriately by any of our customers who follow the DiscoCare treatment algorithm," (3) stated repeatedly that "[DiscoCare] do[es] not code procedures for physicians, hospitals, or other facilities,' and (4) specifically represented, "[t]he only thing we're doing now I suppose that is different is that we're being much more systematic in organizing those cases to make sure that the proper diagnostic algorithm is followed[.]" *Id.* at ¶¶ 270-71. Taking the allegations in the CCAC as true, these representations were false and misleading when made.[13] Furthermore, because the material for the allegations had been gleaned by the media from publically available documents, it is simply not plausible to infer that Baker and Gluk reasonably believed their denials and misstatements were true, or acted only negligently with respect to the accuracy of their statements. The only compelling, possible inference is that Baker and Gluk were either aware of the truth and intentionally misled investors (or remained silent while investors were being misled), or were willfully blind and severely reckless in ignoring the truth.

Gluk's attempt to claim there is a "plausible, nonculpable explanation for any alleged false statements" falls far short of the mark. *See* Gluk's Reply at 3-4. He claims he and his staff were

---

in question actually said is preposterous, and on its own would indicate severely reckless behavior.

[13]In his reply, Baker argues these statements were not wholly false because it is incorrect that the DiscoCare algorithm was a "fiction;" according to Baker, it was actually "a valid treatment model used to ensure that patients were appropriately screened for the SpineW and procedure." Baker's Reply at 2. But at this stage in the proceedings, the Court must take the facts alleged by Plaintiff as true; therefore, Baker's contentions are irrelevant.

"misled by ArthroCare's sales department," and that this allegation is supported by the Restatement, which states "[i]n a majority of the transactions reviewed, sales personnel involved in the transactions at issue, including a former executive officer, did not communicate information and practices bearing on revenue recognition, and related matters to our finance personnel" and "[i]n at least one instance, affirmative misrepresentations bearing upon revenue recognition appear to have been made by a former executive officer to our Vice President of Finance." *Id.* at 4 (quoting Restatement).  But this portion of the Restatement cannot provide a plausible reason for the denials and omissions by the Individual Defendants after December 2007.  First, this portion of the Restatement does not deal with the insurance billing and healthcare compliance issues that were the subject of the large majority of the articles, but with the improper accounting practices.  Secondly, even if Baker and Gluk were misled at some point by their underlings, it does not explain how they could continue to be misled by "sales personnel" after news articles began surfacing in December 2007, and they were faced squarely with the reports of improper practices at ArthroCare.

At a minimum, Baker's denials and misrepresentations and Gluk's acquiescence in them exhibit extreme recklessness on the part of Baker and Gluk.  Even if they did somehow manage to remain unaware of any improprieties at ArthroCare before December 2007, the red flags in the media should have led them to investigate discrepancies between the media reports and their own knowledge, and thus are strong indicia they acted with scienter—an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Southland*, 365 F.3d at 366.

### ii.    Confidential Witnesses

The second broad category of scienter allegations are those stemming from the confidential witnesses cited in the CCAC.  Plaintiff cites these confidential witnesses as support for the allegation

the Individual Defendants knew improper practices were taking place at ArthroCare.  For instance, CW 10 claims Baker attended weekly staff meetings at which "[d]etailed information about the executives' area of responsibility was provided."  CCAC at ¶ 492.  According to CW 10, "[the executives in the meetings] knew what was going on" with respect to the fraud at ArthroCare.  *Id.*  CW 2 also states Baker attended a multi-day ArthroCare sales meeting in March 2005, at which one ArthroCare sales representative (Jackie Marsh) relayed specifically how she was marketing ArthroCare's products to personal injury attorneys, and "the implication was clearly present that ArthroCare wanted its other employees to pursue that line of sales."  *Id.* at ¶ 494.  CW 6 (a former Regional Sales Manager) says Baker was a hands-on manager, and knew of the reimbursement issues with Spine Wands.  *Id.* at ¶ 495. He also claims Gluk knew the lack of insurance approvals was limiting sales of Spine Wand products. Thus, when the Spine division suddenly began experiencing record growth and nothing had changed regarding reimbursement,  "[t]he only possible explanation was cheating, and that was obvious."  *Id.* at ¶ 495.  On July 26, 2007, Gluk announced the Spine division had a 72% higher growth rate than the expected growth rate for the year.  CCAC at ¶ 197.

CW 6 also states Baker attended the national sales meeting in January or February 2006, during which a presentation was made about promoting the personal injury model used by Jackie Marsh.  *Id.* at ¶ 496.  CW 6 states Jackie Marsh and other salespeople were talking about their success with the DiscoCare Model, and thus "they decided to increase SpineWand costs."  *Id.*  CW 6 does not state who "they" are (i.e., who exactly was responsible for deciding to increase SpineWand costs), or any basis for his assertion that the decision to increase costs was connected to the 2006 national sales meeting.  *Id.* According to CW 11 (a former Temporary Cost Accountant), Baker conducted meetings with employees in 2008 in which he assured them everything was fine, but his claims and denials "did not sound credible."  *Id.* at ¶ 497.

CW 16 (a former Controller and Director of Global Accounting who worked at ArthroCare for eleven months, from June 2006 through June 2007) also states Gluk was aware DiscoCare had been improperly accounted for as an unrelated entity.  Pl.'s Resp. at 4.  CW 16's basis for this assertion is that the entire accounting department was aware ArthroCare should have accounted for the DiscoCare transactions as "related-party transactions" (and immediately recognized revenue), but had not done so. *Id.*  CW 16 states that, as head of accounting, "Gluk would have known this and been involved in the effort...to persuade PwC to sign off on improper accounting for DiscoCare." *Id.*  CW 16 states with respect to Baker that he had "a lot" to do with the problems reported in the media about ArthroCare, and that his and the other senior executive's "sole purpose [was] to build [ArthroCare] up and make as much on the stock as the can and then sell the Company in five years." CCAC at ¶ 488.  CW 16 states "[t]hey openly joked about their eventual big payday and to retire.  That was their purpose." *Id.* CW 16 claims this was corroborated by an announcement on April 21, 2008 that ArthroCare had "initiated a review of strategic alternatives," which he claims is standard language indicating they were considering selling the company.  *Id.*  He also claims Raffle and Baker never spoke about the average sales price of a SpineWand, and Baker "wanted to avoid [this] topic during conference calls so he wouldn't have to talk about it.  They all knew...there was no way Baker didn't know." *Id.* at ¶ 490.

Considering all of the allegations based on confidential witnesses sources, the Court finds they are far too vague to support a strong inference of scienter on the part of either Baker or Gluk.  The allegations essentially amount to a charge that because the Individual Defendants were the CEO and CFO and were involved in running the company, they must have known what was going on, as (in hindsight) it was "obvious."  The law of the Fifth Circuit is clear: "pleadings of scienter may not rest on the inference that defendants must have been aware of a misstatement based on their positions with the company." *Abrams*, 292 F.3d at 432.  Likewise, "corporate officers are not liable for acts solely because

they are officers, even where their day-to-day involvement in the corporation is pleaded." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  Without specific allegations the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem, the allegations concerning the confidential witnesses' statements are far too indefinite to add to any inference of scienter.  *See Indiana Elec.*, 537 F.3d at 535-41 (holding that even a CEO's boasting "there is nothing in this company I don't know" was insufficient to support a strong inference of scienter on his part).

Furthermore, the fact the accusations come from confidential sources further detracts from their weight in the scienter analysis.  "Following *Tellabs*, courts must discount allegations from confidential sources."  *Indiana Elec.*, 537 F.3d at 535.  To be given any weight, confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source .... would possess the information pleaded."  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).  The complaint should give details such as the person's job description, individual responsibilities, and specific employment dates.  *Cent. Laborers' Pension Fund v. Integrated Elec. Serv. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007).  Furthermore, plaintiffs must allege with particularity when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred.  *Indiana Elec.*, 537 F.3d at 538; *Southland Secs. Corp.  v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 382 (5th Cir. 2004).

Simply put, the CCAC in this case fails to provide sufficient detail to give the allegations of the confidential witnesses credibility.  Although the CCAC does give some information as to the jobs and employment dates of the confidential sources, the information provided is ambiguous, to say the least.  There is hardly a single instance in which one of the CWs alleges they had a conversation with or overhead a comment by either Baker or Gluk and also states when and where the conversation occurred.

Many of the CWs simply state their own conclusions about what occurred, without giving any meaningful details to support for those conclusions. For instance, CW 10 states that Baker attended "weekly staff meetings every Tuesday or Wednesday" that were attended by all the top executives and lasted for about 90 minutes," and solely on this basis concludes that all the executives in the meetings "knew what was going on" with respect to the fraud at ArthroCare. *Id.* There is absolutely no rational basis in the CCAC for CW 10's conclusion. The allegations of all the confidential witnesses are replete with the same problems: far too little detail, and far too many conclusory, unsupported assertions about what the Individual Defendants knew. *See, e.g.* CCAC at ¶ 496 (CW 16 stating "They all knew...there was no way Baker didn't know" without any concrete basis for the assertion. *Id.* at ¶ 490). All in all, the Court finds the allegations of the confidential witnesses are far too vague and conclusory to add anything to the inference of scienter in this case.

### iii.    Insurance

Plaintiff claims another red flag that indicates scienter on the part of the Individual Defendants is the fact ArthroCare "recently settled several lawsuits relating to allegations of insurance fraud" by ArthroCare, issuing payments of $2,500,000 to State Farm Insurance Company, and $1,000,000 total to GEICO, The Hartford, and Metropolitan Property & Casualty Insurance Company, and—as part of the settlements—agreeing not to seek payment from any of the insurers on any pending Spine Wand claims for which the Spine Wand was provided in exchange for an LOP. CCAC at ¶ 7. Plaintiff argues the Individual Defendants were on notice of this litigation, which operated as another red flag. Although the Fifth Circuit has not considered this issue, other circuits have indeed stated the "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" is an indicia of scienter in securities fraud actions. *See, e.g. Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th

-34-

Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)).  Thus, this allegation may add somewhat to an inference of scienter.

However, the Court notes that although Plaintiff cites the insurance settlements as a factor indicating scienter, the Court cannot locate anywhere in the CCAC—which is over 330 pages—the specific dates of the alleged insurance lawsuits and/or settlements, or the dates on which the Individual Defendants became aware of those lawsuits and/or settlements.  The Court assumes that if this information were available, Plaintiff would have made this plain in its pleadings.  Therefore, the Court assumes it is not available, and finds this vagueness greatly reduces the persuasiveness of the insurance settlements as an indicia of scienter.

### iv.    Magnitude of Fraud

Even though GAAP violations are not, in and of themselves, sufficient to establish scienter, "when the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor or scienter."  *In re Triton Energy Ltd. Securities Lit.*, 2001 WL 872019 at *11 (E.D. Tex. 2001); *In re Seitel, Inc. Secs. Ligit.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) ("While a financial restatement by itself is not sufficient to raise a strong inference of scienter...significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter.").

The Restatement in the instant case covers over four years.  It brought to light numerous accounting irregularities and fraudulent practices within ArthroCare, and reduced gross revenue by a significant amount for each of the years in question.  As stated above, the Restatement reduced total revenue for the years 2007, 2006, 2005 and 2004 by approximately 12.4%, 7.3%, 4%, and 1%,

-35-

respectively, and decreased net income by 98.9% (from $43.2 million to $0.4 million),[14] 12.6% (from $31.7 million to $27.7 million), and approximately 19% in 2007, 2006, and 2005, respectively.  *Id.* at ¶¶ 319, 8.  Many courts have held significant overstatements of revenue or income "tend to support the conclusion that defendants acted with scienter."  *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 234 (D. Mass. 1999); *In re Seitel, Inc. Secs. Ligit.*, 447 F. Supp. 2d at 705 (finding significant support for an inference of scienter where revenue had been restated downward 30% in one year and 15% in another); *In re MicroStrategy, Inc. Sec. Lit.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) (income was restated downward by approximately 290%); *In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) (income was restated downward by approximately 152% over a two year period).  "[C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly."  *MicroStrategy*, 115 F. Supp. 2d at 636. Thus, the magnitude of the Restatement in this case, the fact it occurred over a substantial period of time, the relative simplicity of the issues involved—while perhaps not sufficient on their own to establish scienter—do significantly contribute to a finding of scienter on the part of the Individual Defendants.

   v.   **Insider Stock Sales**

   Plaintiff also alleges both Baker and Gluk sold stock in unusual and suspicious amounts during the Class Period.  For instance, according to the CCAC, Baker sold approximately 613,000 shares of stock and reaped proceeds of more than $26 million between May of 2005 and August of 2007, whereas in the two years prior to the Class Period (July 2003 to February 2005), he sold only 40,000 shares total and reaped total proceeds of approximately $1 million.  *See* CCAC at ¶¶ 482-86.  "Insider stock sales

---

[14]At the hearing on June 18, 2010, ArthroCare's attorney claimed this is a skewed statistic because the reduction in net revenue in 2007 is primarily due to the change in how ArthroCare accounted for its acquisition of DiscoCare.  But the improper accounting for DiscoCare is not separate from the allegations of fraud in this case—it is central to those allegations.  Thus, it hard for the Court to understand the argument that the statistic does not accurately reflect the extent to which the improper practices had inflated revenue prior to the Restatement being issued.

may be probative of scienter if they occur in suspicious amounts or at suspicious times." *Abrams*, 292 F.3d at 435. In order for sales to be suspicious in this context, they must be "out of line with prior trading practices or at times calculated to maximize personal profit." *Id.* Because corporate executives are often paid in stock and stock options, and often trade those securities, a court will not infer fraudulent intent from the mere fact that the officers have sold some of their holdings. *Indiana Elec.*, 537 F.3d at 543.

Both Individual Defendants argue no inference of scienter can be drawn from their stock sales because they sold much of the relevant stock pursuant to a 10b5-1 trading plan, which renders the sales non-suspicious. A 10b5-1 plan is an agreement "which allows corporate insiders to set a schedule by which to sell shares" over time, and which can "raise an inference that the sales were pre-scheduled and not suspicious." *See Cent. Laborers' Pension Fund v. Integ. Elec. Servs. Inc.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007) (quotation omitted). This is particularly true where the stock sales at issue represent only a small portion of each seller's overall holdings. *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994) (finding sales based on a pre-determined trading plan coupled with small sales amounts rebutted allegations of scienter)).

However, whether or not the stocks in this case were sold pursuant to a 10b5-1 trading plan is irrelevant at this stage in the proceedings, as the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion. For instance, the First Circuit recently considered the assertion made by various individual defendants that their trades were made pursuant to a 10b5-1 plan, and thus could not establish scienter. *Mississippi Public Employees' Retirement Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008). The court held:

It was defendants' choice to move to dismiss the case on the pleadings without presenting evidence.  As a result, there is no evidence of when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans.

*Id.*

The First Circuit's common sense reasoning applies to the present case as well.  Although evidence of the exact nature of the Individual Defendants' 10b5-1 trading plans may well refute evidence of insider trading, such evidence is not now before the Court.  Thus, the Court finds the insider trading claims in this case do provide at least some support for an inference of scienter, as Plaintiff alleges in detail sales of stock by the Individual Defendants during the Class Period that are suspicious in amount and timing.  These are allegations which support a motive to deceive by the Individual Defendants, and therefore add to the inference of scienter.

However, it should also be noted that courts have found the length of the class period impacts the inference that can be drawn from securities trading.  *See e.g. In re Dell*, 591 F. Supp. 2d at 897 (citing cases).  The Fourth Circuit, for instance, labeled a class period of 46 months "exceedingly long" and declared "such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades."  *Teachers' Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007).  The Class Period alleged in this case is a little over three years and nine months, or 45 months.  Because of the length of the Class Period, the inference of scienter drawn from the allegations of insider trading is diminished somewhat, although not entirely.

### vi.    Bonuses

Plaintiff also alleges the Individual Defendants had motive to misrepresent ArthroCare's financial results because of "enormous cash bonuses and stock option grants that were closely tied to the Company's financial results."  CCAC at ¶ 501.  Specifically, according to Plaintiff, Gluk was eligible

to receive a cash bonus of 60% of his base salary if the company achieved specific financial objectives and Baker, as CEO, was eligible to receive a cash bonus of 100% of his base salary, depending on the level of achievement attained by ArthroCare with respect to its total net revenue and EBITDAC (earnings before interest, tax, depreciation, amortization, and compensation) goals.  *Id.* at ¶ 502. Plaintiff alleges Baker received a total of over $2 million in salaries and bonuses during the Class Period and Gluk a total of over $1 million, which neither would have received had they reported ArthroCare's true financial results as restated.  *Id.* at ¶ 503.

The Fifth Circuit has held that in most cases "incentive compensation can hardly be the basis on which an allegation of fraud is predicated."  *Tuchman v. DSC Communications Corp*., 14 F.3d. 1061, 1068 (5th Cir. 1994).  If it were, nearly all corporations and their executives would be subject to securities fraud allegations.  *Id.*  These kinds of bonus plans may be considered in conjunction with other scienter allegations, but are probative only in extraordinary cases.  *Indiana Elec*., 537 F.3d 544.  Overall, the allegations relating to the ArthroCare bonus plans in this case provide only slight weight, if any, in favor of inferring scienter.   The fact the Individual Defendants base their compensation on the performance of the company (as measured partly by revenue-related numbers), is not surprising or suspicious in and of itself.  There are few details of the bonus plans alleged in the CCAC, and none which indicate a nefarious or fraudulent intent on the part of the Individual Defendants (such as a change to the bonus structure by the executives to tie it more intimately with company performance).  *See, e.g. In re Dell*, 591 F. Supp. 2d at 898.

### vii.    Sarbanes-Oxley Certifications

Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports.  *See* 15 U.S.C. § 7241(a).  Each officer must certify, *inter alia*, that he and other officers are responsible for establishing and maintaining internal controls and certify

their responsibilities for financial reports in each quarterly and yearly filing.  15 U.S.C. § 7241(a)(4)(A);

CCAC at ¶ 239.  According to Plaintiff, the Individual Defendants completed certifications pursuant to

§§ 302 and 906 of the Sarbanes-Oxley act which were false because the Individual Defendants knew

ArthroCare's internal accounting controls were defective and its financial statements misleading.  *Id.*

at ¶¶ 240-41.  Baker and Gluk issued these certifications in connection with ArthroCare's SEC filings

on August 4, 2006; October 31, 2006; February 27, 2007; May 1, 2007; August 1, 2007; October 29,

2007; February 29, 2008; and May 12, 2008.  *Id.* at ¶ 242.

However, it is well-settled that Sarbanes-Oxley certifications, standing alone, are not indicative

of scienter—otherwise, scienter would be established in every case where there was an accounting error

or auditing mistake made by a publicly traded company.  *Indiana Elec.*, 537 F.3d at 545; *Cent. Laborers'*

*Pension Fund*, 497 F.3d at 555.  Instead, to infer scienter from Sarbanes-Oxley certifications there must

be "facts establishing that the officer who signed the certification had a 'reason to know, or should have

suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial

statements contained material misstatements or omissions.'"  *Indiana Elec.*, 537 F.3d at 545 (quoting

*Garfield*, 466 F.3d at 1266)).  Based on the substantial red flags that were present in this case, which are

discussed at length *supra*, the Court finds the two SOX certifications that were signed after December

11, 2007 in connection with financial statements that were subsequently restated contribute significantly

to a strong inference of scienter, as there were clearly facts in the public domain at that time which gave

the Individual Defendants reason to know or suspect the financial statements they were then signing

contained material misrepresentations or omissions.  However, with respect to those Sarbanes-Oxley

certifications signed before December 2007, the Court finds there are not sufficient facts pled in the

CCAC to indicate the Individual Defendants had reason to know, or should have suspected—"due to

-40-

the presence of glaring accounting irregularities or other red flags"—that the financial statements contained material misstatements or omissions.

### viii.   Resignations

Gluk abruptly left the company on December 19, 2008 "[a]s a result of facts identified in the Review."  CCAC at ¶ 312.   On February 18, 2009, ArthroCare (in an announcement expanding the scope of the previously-announced Restatement) also announced the resignation of Defendant Baker as CEO.  *Id.* at ¶ 316.  In the same announcement, ArthroCare stated it had found evidence the Spine division had engaged in and caused others to engage in fraud and improper practices, admitted these practices may have been going on since at least 2006, and admitted it was under investigation by U.S. Attorney's offices in South Carolina and Florida in connection with DiscoCare.

Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis.  *See Abrams*, 292 F.3d at 434; *Southland*, 365 F.3d at 382-383.  The resignation of officials is, in and of itself, unavailing as proof of the commission of fraud when no specific evidence indicates the resigning officials or their replacements knew of any accounting irregularities or that such irregularities were the reason for their resignations.  *Southland*, 365 F.3d at 383.  However, in this case the timing of the resignations of Gluk and Baker, coupled with the fact that Gluk expressly resigned as a result of facts identified in the Review, does strongly indicate the resignations were related to the review and Restatement.  However, it would not be irregular or unusual for an executive who was merely negligent—as opposed to fraudulent or severely reckless—to leave in the wake of the discovery of substantial accounting errors and irregularities spanning almost four years.  Thus, the resignations in this case bear little, if at all, on the scienter analysis.

### ix.   Conclusion

Given all the foregoing, the Court finds the facts pled—including the presence of significant, repeated red flags, the role of the Individual Defendants in the company, the magnitude and duration of the Restatement and the fraud, the allegations of insider trading, and the Sarbanes-Oxley certifications—collectively give rise to a strong inference of at least severe recklessness on the part of the Individual Defendants after December 11, 2007.  However, before December 11, 2007 the inference is much weaker; indeed, when asked to explicate his most damning scienter allegations at the June 18 hearing, Plaintiff's counsel talked primarily about the red flags in the media, which were undisputedly not present before December 2007, and accordingly can add nothing to an inference of scienter before that date.

In accordance with all the foregoing, the Court finds the totality of the factual allegations in the CCAC support a strong inference of scienter under 15 U.S.C. § 78u-4(b)(2) on the part of the Individual Defendants for any misrepresentations or omissions made after the first news article appeared on December 11, 2007.  However, the CCAC does not support a strong inference of scienter on the part of the Individual Defendants before that date.  Therefore, Defendants Baker and Gluk's Motions to Dismiss are GRANTED IN PART and DENIED IN PART, in accordance with the foregoing opinion.

### D.    Loss Causation

Defendant Gluk also claims Plaintiff has "failed to plead that Gluk's actions were the cause of [ArthroCare]'s stock price decline and, in failing to do so, has not met the burden of pleading loss causation." Gluk's Mot. Dismiss at 9.  The PSLRA does require plaintiffs to plead loss causation—"*i.e.*, a causal connection between the securities violation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); 15 U.S.C. § 78u-4(b)(4).  An allegation of loss causation is subject to the requirements of Rule 8, such that the plaintiff's "short and plain statement" required by Rule 8(a)(2) of

the Federal Rules of Civil Procedure "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id*. at 346.

Loss causation cannot be satisfied simply by alleging that the price of the security on the date of purchase was inflated because of the misrepresentation. *Id*. at 338. The Supreme Court has held "[a]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id*. at 342. In other words, there is not necessarily a link between an inflated purchase price and a later economic loss; the subsequent lower price may reflect changed economic circumstances exclusive of the inflated purchase price, changed investor expectations, new industry- or firm-specific facts, or other events unrelated to the inflated purchase price. *Id*. at 342-43. Thus, there must be sufficient allegations the misrepresentations actually ***caused*** plaintiffs' loss—it is insufficient to simply allege the misrepresentation "touches upon" a later economic loss. *Id.* at 343; *see also Glaser v. Enzo Biochem, Inc.*, 646 F.3d 474, 477 (4th Cir. 2006) ("*Dura* requires plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed"); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 167 (N.D. Tex 2007) ("To allege loss causation adequately, Plaintiffs must explicitly allege a corrective disclosure—*i.e.*, a statement that corrects a previous misrepresentation or discloses a prior omission—that, when disclosed, negatively affected the value of the security.").

In this case, the CCAC fulfills the requirements of Rule 8 with respect to loss causation. It provides a short and plain statement that gives Gluk fair notice of Plaintiff's claim that his misrepresentations and omissions caused ArthroCare's stock to be artificially inflated and that the revelation of the truth caused the price of the stock to drop. *See* CCAC at ¶¶ 523-38. The CCAC alleges in detail how the decline in ArthroCare's stock price by approximately 65%—from its Class Period high of $65.70, to $23.21 on July 21, 2008 (the day ArthroCare first announced there would be a

Restatement), and its further decline to a closing price of $4.50 on February 18, 2009—was a direct result of the nature and extent of the revelations made to investors and the market in the public announcement that a Restatement would be forthcoming and then in the Restatement itself.  CCAC at ¶¶ 523-538.  Although Gluk notes correctly that under *Dura* an artificially inflated purchase price is not **necessarily** linked to a later economic loss, the CCAC clearly alleges that the purchase price of ArthroCare's stock was inflated due to fraud on the part of Defendants, and that the subsequent stock price drop was directly caused by the truth being revealed.  The CCAC thus satisfies the requirements of Rule 8 with respect to the issue of loss causation, and Gluk's motion to dismiss is DENIED on this ground.

## II.    Defendant ArthroCare's Motion to Dismiss [#166][15]

Defendant ArthroCare alleges three broad bases for dismissal of the CCAC: specifically, it claims the CCAC fails to adequately allege (1) falsity; (2) scienter on the part of ArthroCare; and (3) control person claims against Applegate and Raffle.  Arthro.'s Mot. Dismiss [#166].  The falsity claim is almost identical to that raised by Baker.  The Court considered it *supra*, in section (I)(B), and found the CCAC adequately pleads falsity.  Therefore, ArthroCare's motion to dismiss is DENIED on this ground, and the Court turns to ArthroCare's other claims.

### A.    Scienter

As discussed above, § 10(b) and Rule 10b-5 require proof the defendant acted with "scienter"—*i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  Both intent and "severe recklessness" are sufficient to satisfy the substantive scienter requirement. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400,

---

[15]The standard for dismissal for claims under § 10(b) and Rule 10b-5, as set forth in section (I)(A), *supra*, applies with equal force in the context of Defendant ArthroCare's motion to dismiss.

407-08 (5th Cir. 2001).  Under the PSLRA, a complaint must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind in order to avoid dismissal.  15 U.S.C. § 78u04(b)(2); *Tellabs*, 551 U.S. at 313.

Whether Plaintiff has adequately pled scienter on the part of ArthroCare is a complicated question, as the doctrine of corporate scienter remains a somewhat murky concept in this Circuit.  In *Southland*, the Fifth Circuit rejected the "group pleading" approach to corporate scienter.  *Southland Sec. Corp v. INSpire Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004).  Specifically, the *Southland* court held that "[f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter...it [is] appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Id.* at 366.  By way of explanation, the *Southland* court quoted *In re Apple*, in which a California district court explained:

> It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, *i.e.*, knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement[.]

*Id.* (quoting *In Re Apple Computer, Inc. Secs. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D.Cal. 2002)).  This is consistent, the *Southland* panel reasoned, with the general rule that in causes of action "where an essentially subjective state of mind" is one element of the cause of action along with some sort of act or omission, the required state of mind must exist in the individual who performs the act or omission (or causes it to be performed), "and may not simply be imputed to that individual on general principles

-45-

of agency." *Id.* Thus, "[w]hile...a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee"; instead, "[a] corporation can be held to have a particular state of mind ***only*** when that state of mind is possessed by a single individual." *Id.* at 367 (emphasis added) (quoting *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988)). This means, in practice, that plaintiffs must "distinguish among defendants and allege the role of each" in pleading corporate scienter. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

In *Southland*, the Fifth Circuit concluded by noting the plaintiffs had not alleged that "any individual [corporate] director, officer, or employee other than the named individual defendants had acted with scienter in or respecting the making or issuing of any of the complained of statements or in ordering or approving any of such statements or furnishing information or language for inclusion therein or omission therefrom, or the like." 365 F.3d at 367. As a result, the *Southland* court found it was only necessary "to address the allegations claimed to adequately show such state of mind on the part of the individual defendants." *Id.* The present case is identical in that respect: Plaintiff has not alleged any individual ArthroCare director, officer, or employee other than the named defendants—Baker, Gluk, Applegate, and Raffle—acted with scienter. Therefore, the Court must look to the state of mind of those Defendants to determine whether Plaintiff has pled an inference of scienter with respect to ArthroCare.

      **i.**        **Scienter of the Individual Defendants**

First, ArthroCare claims the CCAC does not adequately allege corporate scienter because it does not adequately allege the scienter of either Baker or Gluk, and therefore no scienter can be imputed to ArthroCare. However, the Court finds—as discussed, *supra*—that Plaintiff **has** adequately alleged the scienter of Baker and Gluk after December 11, 2007, and therefore this argument is foreclosed at least

after that time.  *See supra*, sec. (1)(C).  Because the CCAC contains pleadings establishing the requisite level of scienter on the part of Baker and Gluk after December 11, 2007, the CCAC also establishes the requisite level of scienter on the part of ArthroCare after December 11, 2007.

ii.    **Scienter of the Control Person Defendants**

Plaintiff also argues the scienter of Applegate and Raffle is relevant to whether scienter has been pled on the part of ArthroCare, as the Control Person Defendants allegedly acted deliberately in omitting or affirmatively misrepresenting information "for inclusion in various public filings or reports."  Pl.'s Resp. at 23-24.  The *Southland* panel did imply, in passing, that a corporation acts with scienter where the employee who furnished the "information or language for inclusion therein or *omission therefrom*" acted with scienter.  365 F.3d at 367.  But the panel also explained, as stated above, that "[a] corporation can be held to have a particular state of mind *only* when that state of mind is possessed by a single individual."  *Id.* at 367 (emphasis added). "The PSLRA requires the plaintiffs to distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud" by pleading "specific factual allegations" linking each corporate officer to a statement, such as "a signature on the document or *particular factual allegations explaining the individual's involvement* in the formulation of either the entire document, or that specific portion of the document containing the statement."  *Id.* at 365.

In the present case, Plaintiff does not offer any specific factual allegations linking Raffle or Applegate to any specific document, portion of a document, transaction, financial statement, or any other representation by ArthroCare.  Plaintiff does not allege whether Raffle or Applegate provided the information, drafted the language, or authorized its inclusion.  Without specific allegations of this type, the CCAC lacks the specificity to establish that either Raffle or Applegate acted with scienter.  Although Plaintiff points out repeatedly that ArthroCare expressly admitted the actions of Raffle and Applegate

"led to" various accounting errors and irregularities identified in the Restatement, this bare statement

is simply not sufficient to infer either Raffle or Applegate acted with scienter (as opposed to negligence).

To allow Plaintiff to impute scienter to ArthroCare on the basis of this single statement would be to

embrace the group pleading doctrine specifically rejected by the *Southland* court.  Because Plaintiff has

not pled a single particular fact which give rise to a strong inference that either Raffle or Applegate was

connected with any ***particular*** false statement or omission by ArthroCare or acted with scienter, the

Court rejects this basis for imputing scienter to ArthroCare.

### iii.    Conclusion

In accordance with the foregoing, the Court finds ArthroCare's motion to dismiss should be

GRANTED in part and DENIED in part.  As with the Individual Defendants, the CCAC pleads

allegations which give rise to a strong inference of scienter on the part of ArthroCare after December

11, 2007, but not before.

### C.    Control Person Claims

ArthroCare claims Plaintiff has failed to state a valid control person claim against either Raffle

or Applegate.  As is discussed at length in sections III and IV, this Court agrees.  ArthroCare's motion

to dismiss is therefore GRANTED on this ground.

## III.    Defendant David Applegate's Motion to Dismiss [#169]

### A.    Legal Standard for Control Person Claims

Plaintiff seeks to hold Defendant Applegate liable on a single ground: as a "control person"

pursuant to § 20(a).[16]  15 U.S.C. § 78t(a).  Section 20(a) states anyone "who, directly or indirectly,

---

[16]"Control person" liability is, of course, derivative—it is predicated on the existence of an independent violation of the securities laws.  *Rubinstein v. Collins*, 20 F.3d 160, 166 n. 15 (5th Cir.1994); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n. 8 (5th Cir. 1996).  Because the Court finds Plaintiff has stated a predicate claim under § 10(b), the Court proceeds to consider the control person claims under § 20(a).

controls any person liable [for Exchange Act violations] shall also be liable ... to the same extent as such controlled person[.]"  *Id.*  The Fifth Circuit has held "[t]he legislative history of...§ 20(a) demonstrates that Congress enacted [it] to address the specific evil of persons seeking to evade liability under the acts by organizing 'dummies,' who, acting under their control, would commit the prohibited acts."  *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1118 (5th Cir. 1980) (citations omitted).

There are two distinct components to a § 20(a) claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant.  *In re TETRA Techs., Inc. Secs. Litig.*, 2009 WL 6326865 (S.D. Tex. 2009) (citing *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)).  The heightened pleading requirements of the PSLRA and Rule 9(b) do not apply to control person violation claims.  *Trendsetter Investors, LLC v. Hyperdynamics Corp.*, 2007 WL 172627 at *15 (S.D. Tex. 2007).

## B.   Application to the Present Case

From 2004 to 2008, Applegate was Senior Vice President and General Manager of ArthroCare's Spine division.  CCAC at ¶¶ 21-22.  Applegate claims he did not control the actions of the primary violators—Baker (CEO) and Gluk (CFO)—during that time.  *See* Applegate's Mot. Dismiss at 11. In fact, these men were clearly his corporate superiors based on their titles and positions within the company.  *Id.*  Applegate also claims he did not have control over Baker and Gluk's material misrepresentations or omissions to the investing public (which are the basis of their alleged § 10(b) violations).  There is no allegation in the CCAC that Applegate actually made any statements to the public or was personally involved in any way in any false or misleading statements, nor is there an explanation for how he could have controlled such promulgations by Baker and Gluk, who were undeniably his superiors at ArthroCare.

-49-

Plaintiff claims whether Applegate controlled Baker and/or Gluk is a question of fact for the jury. Pl.'s Resp. [#184] at 5-6. It is true that "[d]etermining who is a controlling person is usually an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (internal quotations and citations omitted). However, a plaintiff cannot simply base a control person claim on boilerplate allegations; instead, the plaintiff must provide some factual support which indicates the control person defendant was in a position to control a primary violator. In this case, Plaintiff has alleged no specific facts in the CCAC which would indicate Applegate did in fact control Baker or Gluk; in fact, Plaintiff eschewed even making this claim at the hearing. This issue is similar to that raised in *Middlesex Retirement System v. Quest Software Inc.*, in which a district court considered a control person claim levied against one of the vice presidents of Quest based on the allegation he controlled the actions of his corporate superiors, and held:

> Plaintiff did not allege, and it is difficult for the Court to determine how, as a Vice President, [the defendant] was able to exercise control over the other 10b-5 Defendants when the other 10b-5 Defendants held positions of Vice President or higher; *i.e.*, how can [the defendant] exercise control over either his peer Vice Presidents or his supervisors[?] Moreover, Plaintiff has not alleged how [he] exercised control over Quest. ...Plaintiff has not alleged that [he]caused Quest to file any misstated financial statements. Thus, for Plaintiff to establish [the defendant]'s control person liability, Plaintiff must provide factual support that [he] was in a position to control a primary violator.

527 F. Supp. 2d 1164, 1194 (S.D. Cal. 2007). Likewise, this Court finds there is no genuine issue of material fact as to whether Applegate controlled Baker and/or Gluk—he did not.

However, Plaintiff also makes the marginally stronger argument that the "controlled person" in this case was ArthroCare, rather than either of the Individual Defendants. This assertion requires a showing that Applegate "had the requisite power to directly or indirectly control or influence corporate policy," including facts demonstrating Applegate "had an ability to control the specific transaction or

activity upon which the primary violation is based." *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 716 (N.D. Tex. 2008) (citations omitted). In the CCAC, Plaintiff alleges Applegate, by virtue of his "high-level position, [his] ownership and contractual rights, participation in and/or awareness of [ArthroCare]'s operations and/or intimate knowledge of the false financial statements filed by [ArthroCare] with the SEC and disseminated to the investing public,...had the power to influence and control, and did influence and control, directly or indirectly, the decisionmaking of" ArthroCare. CCAC at ¶ 571. Plaintiff asserts Applegate "was provided with or had unlimited access to copies of [ArthroCare]'s reports, press releases, and public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." *Id.* In particular, Plaintiff alleges Applegate had "direct and supervisory involvement in the day-to-day operations of [ArthroCare] and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same." *Id.* at ¶ 572. Plaintiff cites the Restatement—in which ArthroCare admitted Applegate's and Raffle's actions primarily led to the accounting errors and irregularities—as further support for its claims. *Id.* at ¶ 573.

Cutting through this rhetoric, it is determinative that Plaintiff nowhere alleges Applegate actually controlled the public dissemination of the false statements in question. Plaintiff essentially pleads facts indicating Applegate controlled some of the underlying operations about which misrepresentations were made in ArthroCare's public filings and statements, but not that he controlled the public filings and statements themselves. To adequately plead a control person claim, a plaintiff "must plead facts indicating that the defendant 'had the requisite power to directly or indirectly control or influence corporate policy,'" including facts indicating the defendant had the ability to control the specific activities on which the primary violations are based. *Zagami*, 540 F. Supp. 2d at 716 (quoting

*Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732 at *13 (N.D. Tex. 2002)).   In this case, it is ArthroCare's financial reporting—not the underlying operations or transactions themselves—which forms the basis of Plaintiff's primary claims against the Individual Defendants.   Thus, because there is no allegation Applegate signed any of the press releases or SEC forms which contained the misstatements or omissions, or had final authority over any of ArthroCare's public statements or filings—in other words, because there is no allegation that Applegate had substantial control over the dissemination of any false information to the public, which is the basis of Plaintiff's § 10(b) claims—he cannot be held liable as a control person simply due to his involvement in the underlying activities about which the Individual Defendants are alleged to have misled investors.

In short, Plaintiff has not alleged Applegate had authority over the preparation of the financial statements or press releases or conference calls containing the misleading statements, and thus Plaintiff has not stated a valid control person claim against Defendant Applegate.[17]   Applegate's motion to dismiss is hereby GRANTED.

**IV.     Defendant John T. Raffle's Motion to Dismiss [#170]**

During the Class Period, Raffle was the Vice President of Strategic Business Units for ArthroCare.   He also ran DRS—he incorporated DRS on behalf of ArthroCare, and acted as President, Treasurer, and Sole Director of DRS.   CCAC at ¶ 81.   Like Applegate, Raffle is sued solely under § 20(a), and his motion raises essentially the same law and arguments on control person liability as Applegate's.   Thus, the resolution of it is the same.   Although Plaintiff makes much of the fact ArthroCare admitted in a press release that "[f]acts identified in the [r]eview indicate that actions

---

[17]At most, the allegations in the CCAC indicate Applegate was a secondary actor who aided and abetted Baker and Gluk in their primary violations of § 10(b).   But the Supreme Court has explicitly found "the 1934 [Exchange Act] does not itself reach those who aid and abet a § 10(b) violation."   *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177.   To hold otherwise, it explained, would be to "impose ... liability when at least one element critical for recovery under 10b-5 is absent: reliance." *Id.* at 180.

employed by senior sales management, including [Raffle]..., primarily led to the accounting errors and possible irregularities now being considered as part of the Company's financial restatement," Pl.'s Resp. at 9-10, the fact Raffle's actions led to or caused various accounting errors or irregularities has nothing to do with whether he controlled the material misrepresentations disseminated by the Individual Defendants and ArthroCare that form the basis for the § 10(b) claims in this case.  Plaintiff does not allege Raffle had general control over either of the Individual Defendants, ArthroCare, or over any public statement, filing, or conference call associated with ArthroCare.  Because Plaintiff has not alleged any facts demonstrating Raffle controlled the particular acts alleged to have violated the securities laws in this case, Plaintiff has failed to state a control person claim against Defendant Raffle.  Raffle's motion to dismiss is therefore GRANTED.

## V.    Defendant PriceWaterhouseCooper's Motion to Dismiss [#171]

PwC claims the facts pled in the CCAC do not give rise to an inference of fraud on the part of PwC, and instead give rise to an inference PwC did **not** act with scienter, as Plaintiff acknowledges that ArthroCare admitted its own personnel misled PwC about the accounting irregularities that led to the Restatement.  PwC's Mot. Dismiss at 12.

### A.    Legal Standard

Plaintiff's claims against PwC also arise under § 10(b) and Rule 10b-5, and thus Plaintiff must satisfy the heightened pleading requirements imposed by Rule 9(b) and the PSLRA to avoid dismissal of these claims.  Again, § 10(b) and Rule 10b-5 require proof the defendant acted with "scienter"—*i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.  Both intent and "severe recklessness" are sufficient to satisfy the substantive scienter requirement. *Nathenson*, 267 F.3d at 407-08.  Many circuit courts have concluded the meaning of recklessness in securities fraud cases is "especially stringent" when the claim is made—as it is here— against an outside

auditor.  *See, e.g., PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004).  Specifically, "[r]ecklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate[s]' an actual intent to aid in the fraud being perpetrated by the audited company."  *Id.* (*quoting Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir.1982)); *Rothman v. Gregor*, 220 F.3d 81, 98 (2nd Cir. 2000).  It must be proven not merely that there was a deviation from accounting principles, but

> ...that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*PR Diamonds*, 364 F.3d at 693-94 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994)).  Thus, "to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud."  *Id.* at 694; *In re SmarTalk Teleservices, Inc. Secs. Litig.*, 124 F. Supp. 2d 505, 514 (S.D.Ohio 2000); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1570 (9th Cir. 1990).

## B.  Application to the Present Case

The CCAC alleges PwC served as ArthroCare's outside auditor during the entire Class Period.  CCAC at ¶ 405.  In that role, it issued audit opinions about ArthroCare's financial statements that were included in its Form 10-Ks for the years ended December 31, 2005, 2006, and 2007.  *Id.*  These three audit opinions are the sole source of false statements made by PwC.  Plaintiff alleges the audit opinions PwC issued each year during the Class Period were false and misleading in that they claimed ArthroCare's fiscal year-end financial statements were correct.  In an attempt to raise a strong inference of scienter on the part of PwC with respect to the allegedly false audit opinions, Plaintiff pleads the

following particularized facts: (1) PwC had been ArthroCare's outside auditor since its initial public offering, CCAC at ¶ 24; (2) PwC had broad access to ArthroCare's accounting records and information, *id.* at ¶ 466; (3) the financial statements had numerous violations of GAAP and GAAS,[18] *id.* at ¶¶ 405, 455-6; (4) PwC ignored 31 specific red flags that should have alerted it to the existence of fraud at ArthroCare over the course of nine years, *id.* at ¶¶ 427, 456; and (5) PwC made millions of dollars in audit and audit-related fees, which provided its motivation to commit fraud. *Id.* at ¶ 475. The Court will discuss each allegation in turn, and then consider them as a whole.

### i.    Independence of PwC

The allegation PwC was ArthroCare's auditor from its initial public offering until the time of the Restatement is essentially a charge that PwC was not truly "independent" because of its long-standing relationship with ArthroCare. Likewise, the allegations regarding the amount of audit and audit-related fees paid to PwC by ArthroCare also go to whether PwC was truly independent from ArthroCare. Courts have generally held allegations there was a long-standing relationship between the auditor and the company, or that the auditor gained financially by participating in or recklessly disregarding a client company's fraud, are not sufficient under the PSLRA's heightened pleading standard to raise an inference of fraud. *See In re Dell*, 591 F. Supp. 2d at 900; *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994). Of course, if the outside auditing firm is paid exorbitant "consulting fees"—so that it earns more for consulting than for auditing the client—or otherwise gains some sort of "dual role" with respect to the company, this may add to an inference of scienter. *In re Fleming Comps., Inc. Sec. Litig.*, 2004 WL 5278716, at *40 (E.D. Tex. 2004). But in the present case there are no indications PwC had gained any "dual role" with respect to ArthroCare, or that the fees PwC earned were in any way abnormal or

---

[18]GAAS are standards established by the Auditing Standards Board of the American Institute of Certified Public Accountants for the conduct of auditors in the performance of an examination.

exorbitant.  Thus, without more, the mere allegation that PwC had a long-standing relationship with ArthroCare and was paid fees for its work do not add to any inference of scienter on the part of PwC.

### ii.        Access to books and records

Plaintiff also alleges PwC had broad access to ArthroCare's accounting records and information. It it is well established that merely pleading access to a company's private records, without more, does not adequately allege scienter.  *See Fin. Acquisition Partners, LP v. Blackwell*, 2004 WL 2203253, at * 23 (N.D. Tex. 2004) (citing *Arnlund v. Deloitte & Touche*, 199 F. Supp. 2d 461, 477 (E.D. Va. 2002)). However, Plaintiff does present at least one confidential witness (CW 16, a former Controller and Director of Global Accounting who worked at ArthroCare from June 2006 through June 2007) who testifies that PwC was provided information regarding the manner in which ArthroCare intended to account for its transactions with DiscoCare, and PwC initially stated the proposed accounting was improper (because they should be accounted for as related-party transactions, as ArthroCare later admitted).  CCAC at ¶ 467.  However, PwC subsequently issued a clean opinion on the financial statement.  *Id.*  This specific testimony may be sufficient to raise a slight inference of scienter; however, it is at least as plausible that PwC simply changed its opinion about what was the proper accounting for the DiscoCare transaction, perhaps because PwC was given misleading information by ArthroCare executives.

### iii.       Magnitude of fraud and accounting errors

Plaintiff also alleges the plethora of later-identified GAAP and GAAS violations, taken with the other allegations, establish a strong inference of scienter.  The Fifth Circuit has concluded "the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter;" instead, as in other areas, a plaintiff must show the accounting firm deliberately misrepresented material facts or acted with severe recklessness as to the accuracy of its audits or reports.

*Abrams*, 292 F.3d at 432; *Melder*, 27 F.3d at 1103 ("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud").  Such violations, on their own, simply do not represent the extreme departure from the standards of ordinary care that the recklessness standard requires.  Thus, in the absence of additional facts specifying fraudulent intent or the defendant's state of mind, GAAP errors "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." *In re Baker Hughes Sec. Lit.*, 136 F. Supp. 2d 630, 649 (S.D. Tex.  2001).

However, violations of GAAP (such as were recognized in the Restatement) may give rise to an inference of fraudulent intent when they are particularly egregious or are coupled with other specific and properly pled allegations of fraud.  *See S.E.C. v.  Casarta*, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999).  Similarly, a restatement may add significant weight to the scienter calculus based on the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the violated accounting principles.  *In re Fleming*,  2004 WL 5278716 at *37.   Thus, while a financial restatement by itself is not sufficient to raise a strong inference of scienter, "significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter" when coupled with "other allegations that take into account and measure the relative seriousness of the restatement[.]" *In re Seitel, Inc. Secs. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006).  But a court may not rely on "hindsight, speculation and conjecture" to infer that just because the restatement was large, the fraud must have been so obvious and conspicuous that the auditor  either knew of the fraud or was severely reckless in not knowing of it.  *See Reiger v. Price Waterhouse Coopers, LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000).   Instead, there must be  specifically pleaded warning signs indicating such an assumption is merited.  *Id.*

In the instant case, the allegations of GAAP and GAAS violations on the part of PwC, on their own, add nothing to the inference of scienter on the part of PwC. It is undisputed the financial statements issued during the Class Period were not, in many ways, prepared in accordance with GAAP. But this alone cannot establish an inference of scienter on the part of PwC. Plaintiff sets forth a boilerplate, un-particularized list of alleged GAAP and GAAS violations on the part of PwC, alleging these somehow give rise to an inference of scienter, but the Court disagrees. *See, e.g.* CCAC at ¶ 425 ("PwC violated GAAS by failing to exercise due processional care in the performance of the ArthroCare audits."); ¶ 413 ("It cannot be argued reasonably that PwC fulfilled its responsibility in gathering competent evidential matter to support its audit opinion"). Plaintiff does not allege any specific information about what PwC actually did in its audits of ArthroCare, but instead relies on the circular reasoning that PwC *must* have acted with scienter simply because it did not catch the misstatements and GAAP violations in ArthroCare's financial statements that were later identified in the Restatement. *See, e.g.* CCAC at ¶ 415 ("The fact that PwC failed in its role as gatekeeper, did not have the required level of understanding of ArthroCare's business, and did not conduct audits in accordance with GAAS is patently obvious upon consideration of the fact that PwC was ArthroCare's independent auditors [sic] for years but failed to uncover basic GAAP departures in the financial statements."); *id.* at ¶ 449 ("If PwC had performed a proper evaluation, PwC should have uncovered that ArthroCare's control environment appeared to be overly driven by sales generation, resulting in senior management's lack of significant appreciation for internal controls over financial reporting and accounting principles relating to revenue recognition."). In fact, the large majority of Plaintiff's pleading on this issue consists of long explanations of each GAAS principle allegedly violated, followed by the conclusory statement that PwC "clearly" violated that principle based solely on fact the Restatement was issued.

The GAAS standards acknowledge "even a properly planned...audit may not detect a material misstatement," AU § 230.12; thus, the mere fact the audits apparently did not catch the later-revised accounting errors in the financial statements is not conclusive. *In re Dell*, 591 F. Supp. 2d at 903. Plaintiff does not plead any specific details indicating how or when PwC became aware of the misstatements in ArthroCare's earlier disclosures, what PwC's audit entailed, what the basis is for the assumption PwC did not perform appropriate testing (aside from the very fact of the Restatement), how the supposedly missed tests would have revealed the fraud in question, or why there is any reason to believe the alleged deficiencies were purposeful or reckless. *See id.*; *Reiger v. Price Waterhouse Coopers, LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000). This Court will not rely on "hindsight, speculation and conjecture" to infer that just because the Restatement was large, the fraud in question must have been so obvious that PwC either knew of the fraud or was severely reckless in not knowing of it. *Reiger*, 117 F. Supp. 2d at 1013. Plaintiff must specifically plead the existence of warning signs that indicate such an inference is merited, as the magnitude of fraud supports an inference of scienter "only when the plaintiff pleads specific and detailed facts showing that the magnitude either enhanced the suspiciousness of specifically identified transactions, or made the overall fraud glaringly conspicuous."[19] *Id.*

### iv.    Red flags

Plaintiff has attempted to plead the existence of warning signs by claiming PwC ignored a substantial number of red flags—"those facts which come to the attention of an auditor which would

---

[19]It is important to remember there are "potentially [an] infinite number of innocuous reasons an accountant may fail to detect a fraud of large magnitude"—for example, the fraud may have stemmed "from improprieties in transactions that fell outside the scope of the audit, or from manipulations the company concealed from its accountant and the public." *Id.* (citing *In re Livent, Secs. Litig.*, 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999)). For this reason, it is well-settled the mere fact an auditor failed to detect a fraud of large magnitude cannot establish scienter on the part of the auditor. *See, e.g. Ind. Elec.*, 537 F.3d at 534.

place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Dell*, 591 F. Supp. 2d at 904.  In certain circumstances, courts have held allegations of GAAP or GAAS violations, coupled with allegations of deliberately ignoring "red flags," can be sufficient to state a claim of securities fraud. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1209-10 (11th Cir. 2001); *In re Enron*, 235 F. Supp. 2d at 677-79, 706-07.  A red flag creating a strong inference of scienter generally consists of "[a]n egregious refusal to see the obvious, or to investigate the doubtful." *P.R. Diamonds, Inc.*, 364 F.3d at 695.

In this case, Plaintiff alleges ArthroCare's improper revenue recognition practices—such as the fact ArthroCare increased the price of Spine Wands 500% while simultaneously increasing sales of Spine Wands by 95% in 12 months, or the fact ArthroCare habitually entered into major transactions within the last few days of the quarter—were red flags that should have been glaringly obvious to PwC and should have caused it to inquire further into ArthroCare's revenue recognition practices.  CCAC at ¶¶ 71, 206-07, 265, 527.  Plaintiff also points out the extensive news articles which began in December 2007 and ultimately triggered the Restatement (discussed *supra*), the "obvious" lack of internal controls, the improper accounting for the DiscoCare acquisition (which PwC recommended against, but later signed off on), and numerous alleged accounting violations.  *See* CCAC at ¶ 427.  Plaintiff alleges the only way PwC could have missed these "flagrant warning signs" is by turning a blind eye and disregarding the most basic requirements of GAAS.  Pl.'s Resp. at 23.

However, the Court finds none of the red flags are sufficient to establish a strong inference of scienter on the part of PwC because not a single "red flag" establishes PwC knew or recklessly disregarded information at the time it conducted its audits and quarterly reviews.  In fact, the pleadings do not even indicate whether PwC was contemporaneously aware of any of the red flags in question.  A red flag creating a strong inference of scienter consists of "[a]n egregious refusal to see the obvious,

-60-

or to investigate the doubtful." *PR Diamonds*, 364 F.3d at 695.  The majority of the purported red flags listed by Plaintiff are the same conclusory accounting violations detailed above, which are present in almost every securities fraud action.  The only genuine red flag is the "extensive news articles beginning in December 2007 that alleged the exact schemes and proprieties that triggered the Restatement less than two years later."  CCAC at ¶ 427.  However, it is certainly plausible that this red flag failed to put PwC on notice on the fraud because ArthroCare concealed the fraud so well that PwC itself was deceived. The language of ArthroCare's December 19, 2009 press release reads:

> Facts identified in the Review indicate that actions employed by senior sales management...primarily led to the accounting errors and possible irregularities now being considered as part of the Company's restatement.  Those actions included failing to communicate and/or withholding key information and practices bearing on revenue recognition and other accounting issues to [the accounting staff and PwC].

CCAC at ¶ 312.  It is certainly possible that until May 2008, when PwC's general counsel office received a series of anonymous faxes which contained substantially the same allegations as the press reports, *id.* at ¶ 324, PwC simply believed Baker's vehement denials of the news stories.

    v.    **Conclusion**

Based on all the foregoing, the Court finds Plaintiff has not pled sufficiently particularized facts demonstrating PwC had the requisite level of intent.  The inference that PwC intended to deceive investors is far less compelling than the competing inference of non-fraudulent intent.  *See Tellabs*, 551 U.S. at 314.  Importantly, Plaintiff has not alleged ***any*** facts supporting a motive to deceive, or any theory as to why PwC would knowingly mislead investors.  At most, Plaintiff has alleged—in a highly conclusory fashion—negligent conduct on the part of PwC.  But Plaintiff cannot recover without proving PwC acted "***with an intent to deceive***—not merely innocently or negligently," *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784, 1796 (2010) (emphasis in original).  Therefore, PwC's motion to dismiss is GRANTED.

## Conclusion

In accordance with the foregoing,

IT IS ORDERED that Defendant ArthroCare Corporation's Motion to Dismiss [#166] is GRANTED IN PART and DENIED IN PART, in accordance with the foregoing order.

IT IS FURTHER ORDERED that Defendant Michael Baker's Motion to Dismiss [#172] is GRANTED IN PART and DENIED IN PART, in accordance with the foregoing order.

IT IS FURTHER ORDERED that Defendant Michael Gluk's Motion to Dismiss [#169] is GRANTED IN PART and DENIED IN PART, in accordance with the foregoing order.

IT IS FURTHER ORDERED that Defendant Applegate's Motion to Dismiss [#168] is GRANTED.

IT IS FURTHER ORDERED that Defendant John T. Raffle's Motion to Dismiss [#170] is GRANTED.

IT IS FURTHER ORDERED that Defendant PriceWaterhouseCooper's Motion to Dismiss [#171] is GRANTED.

IT IS FINALLY ORDERED that Plaintiff's Motion for Leave to File a Sur-Reply to Baker's Motion to Dismiss [#200] is GRANTED.

SIGNED this the 20th day of July 2010.

_Sam Sparks_
_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE